GIVEN & Others Relators *v.* WRIGHT Collector.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW JERSEY.

Argued March 5, 1886.—Decided April 12, 1886.

An exemption from taxation granted by the government to an individual is a franchise, which can be lost by acquiescence under the imposition of taxes for a period long enough to raise a conclusive presumption of a surrender of the privilege; and such acquiescence for a period of sixty years (and, indeed, for a much shorter period) raises such a presumption.

This was a writ of error directed to the Supreme Court of New Jersey to review a judgment rendered by the Court of Errors and Appeals of that State, affirming a judgment of the Supreme Court, and remitted thereto. The case arose upon a *certiorari* issued in the name of the State, on the relation of certain tax-payers of the township of Shamong, in the county of Burlington, directed to Henry Wright, collector of said township, for the purpose of examining the legality of a certain assessment of taxes, for the year 1876. The taxes complained of were laid upon lands of the prosecutors lying within the bounds of a tract known as the Indian Reservation. According to the New Jersey practice, reasons were filed for setting aside the assessment, and evidence was taken before a commissioner of the court.

The reasons assigned were:

1st. That the lands were not liable to be assessed for tam under the Constitution and laws of New Jersey.

2d. That, by virtue of a contract with the State of New Jersey, contained in the act of the legislature, entitled " An Act to empower certain persons to purchase the claims of the Indians to land in this colony," the lands were expressly exempted from taxation.

The lands on which the assessment was laid were the same lands which were held to be exempt from taxation by this court in the case of *New Jersey* v. *Wilson*, reported in 7 Cranch, 164, where a succinct history of the transactions out of which the claimed exemption grew is given. That decision was made in February Term, 1812. Since that time, for about sixty years before the assessment in question was laid, taxes have been regularly assessed on the lands, and paid without objection. The Supreme Court of New Jersey sustained the assessment, holding that the uninterrupted acquiescence in the imposition of taxes for so long a time raised a conclusive presumption that, by some convention with the State, the right to exemption was surrendered. The Court of Errors and Appeals affirmed this decision, and the case was brought here for review, on the allegation of the plaintiffs in error that the obligation of the contract of exemption had been impaired by the laws of New Jersey under which the tax was imposed.

The alleged contract was contained in a law of the New Jersey Colonial Legislature, passed August 12, 1758. There remained at that time within the colony a remnant of the Delaware Indians, who claimed certain lands in different parts of the colony, which they alleged had never been sold by them. In consequence of a convention had with them, the legislature passed the law in question, entitled "An Act to empower certain persons to purchase the claims of the Indians to land in this colony." The act appointed five commissioners, with authority to lay out any sum not exceeding £1600 proclamation money, to purchase the right and claims of the Indians. The second section of the act was as follows:

"*And whereas* the Indians south of Raritan River, have

represented their inclination to have part of the sum allowed to laid out in land whereon they may settle and raise their necessary subsistence : In order that they may be gratified in that particular, and that they may have always in their view a lasting monument of the justice and tenderness of this colony toward them : *Be it enacted by the authority aforesaid,* That the commissioners aforesaid, or any three of them, with the approbation and consent of his excellency the governor, or the governor or commander-in-chief for the time being, shall purchase some convenient tract or tracts of land, for their settlement, and shall take a deed or deeds in the name of his said excellency or commander-in-chief of this colony for the time being, and of the commissioners, and their heirs, in trust for the use of the said Indian natives, who have or do reside in this colony, south of Raritan, and their successors, forever : *Provided, nevertheless,* That it shall not be in the power of the said Indians, or their successors, or any of them, to lease or sell to any person or persons, any part thereof. And if any person or persons, Indians excepted, shall attempt to settle on the said tract or tracts, it shall and may be lawful for any justice of the peace to issue his warrant to remove any such person or persons from such land. And if any person or persons, Indians excepted, shall fell, cut up, or cart off, any cedar, pine, or oak trees, such person or persons shall forfeit and pay, for each tree so felled, cut up or carted off, the sum of forty shillings, &c."

The 7th section was as follows :

"*And be it further enacted by the authority aforesaid,* That the lands to be purchased for the Indians, as aforesaid, shall not hereafter be subject to any tax, any law, usage, or custom to the contrary thereof in anywise notwithstanding."

In pursuance of this law a tract of about 3000 acres of land, situate in the township of Evesham, in Burlington County, (now in the township of Shamong aforesaid), was purchased by the commissioners for the sum of £740, and conveyed to "His said Excellency, Francis Bernard, Esquire, Governor and Commander in Chief of the Province of New Jersey, and to them the said Andrew Johnston, Richard Salter, Charles Read, John Stevins, William Foster and Jacob Spicer,

Esquires, and their heirs forever: In trust, nevertheless, that they shall permit such Indian natives as have resided or do reside in this colony south of Raritan, and their successors forever, to cultivate and inhabit the same to and for such uses as are declared in an act of general assembly of the Colony of New Jersey, entitled an Act to empower certain persons to purchase the claims of the Indians to lands in this colony."

The tract purchased included a cedar swamp and saw-mill, and was surrounded by wild lands which furnished good hunting ground, and they were sufficiently near the coast for fishing.

The Indian beneficiaries of this trust, who were but a small band (about sixty in all, as stated by the historian Smith), removed to the settlement purchased (which received the name of Brotherton), and remained there until the latter part of the century, when they desired a change in the mode of managing their lands. The old commissioners having died, they desired new ones appointed to take charge of the lands and mill, and to let or lease the same for their use and benefit.

Accordingly, on their petition, an act was passed on the 17th of March, 1796, which appointed three commissioners to take charge of the lands " and lease out the same, from time to time, on such terms, and in such manner as should most conduce to the advantage of said Indians." The commissioners were directed to apply the moneys arising from the lands unto the Indians, or the value thereof in necessaries, such as provisions and clothing, or to such of them as should stand most in need. They were to account annually to the Court of Common Pleas of Burlington County, which court was invested with power to remove them for misconduct, and in case of a vacancy to appoint new commissioners. It was expressly provided, however, that nothing in the act should prevent the Indians from residing on the lands, or cutting wood or timber for their own use.

It was not long after this before the Indians desired to have their lands sold, and to join their brethren at New Stockbridge in the State of New York. The legislature complied with their wishes, and on the 3d of December, 1801, passed an act ap-

pointing commissioners to sell the lands, and to appropriate the money thence arising for the benefit of the Indians. The act directed the tract to be divided up into lots not exceeding a hundred acres in each, and to give notice of the time and place of sale; all of which was done. The lands were sold and deeds of conveyance in fee simple were given to the purchasers; but neither in the law or in the deeds was anything said about exemption from taxes.

After the sale the assessors of the township in which the lands lay proceeded to assess the same for taxes; but, on a *certiorari* from the Supreme Court of New Jersey, the assessment was set aside in September, 1804. On the 1st of December, 1804, the legislature repealed the 7th section of the act of 1758, which contained the exemption from taxes. Another assessment was then made, and the matter was brought before the Supreme Court a second time in the case of *New Jersey* v. *Wilson*, reported in 1 Pennington, 300. The assessment was now sustained. Judges Rossell and Pennington delivered quite elaborate opinions, arguing that, by the act of 1758, and the purchase under the same, the lands were intended as a permanent possession of the Indians as a home, protected against their natural improvidence by being made inalienable by sale or lease, or by the imposition of taxes; that the exemption from taxes was one of the incidents of the Indian tenure, and had no congruity with absolute ownership of citizens, and that when, at the request of the Indians, the land was sold to other parties in fee simple absolute, the abnormal qualities of the Indian tenure were extinguished, and all the conditions which rendered exemption from taxes requisite and proper ceased to exist. Judge Pennington added that the fee was not in the Indians; that the purchasers could not claim title from or under them; that the commissioners were not authorized to sell the interests or rights of the Indians, but to sell the land, the fee of which was in trustees who were agents of the State, and that the State in selling the land was under no obligation to continue the exemption from taxes, and did not do so. On writ of error from this court, however, this judgment was reversed, the act of 1758 was held to be a contract, and the act

of 1804, repealing the exemption, was held to impair the obligation of that contract, and was, therefore, void. *New Jersey* v. *Wilson,* 7 Cranch, 164.

*Mr. P. L. Voorhees* for plaintiff in error, as to the effect of the sixty years' acquiescence in taxation, contended as follows: The statute granting the exemption was an act of sovereign authority, and can only be changed by an equally solemn act. "*Jura eodem modo destituuntur quo constituuntur,*" or as translated in Bouvier's Law Dictionary, "Laws are only abrogated or repealed by the same means by which they are made." Broom's Legal Maxims, 877. Potter's Dwarris, 154.

A statute cannot be repealed by nonuser. Nothing short of a statute can repeal a statute. Sedgwick Stat. and Const. Law, page 121, edition 1857. Smith's Stat. & Const. Construction, page 908, § 790. Potter's Dwarris, 122, 153, 154. 1 Kent Com. [467] 527. 10th edition. *White* v. *Boot,* 2 T. R. 274. *Leigh* v. *Kent,* 3 T. R. 362. *The India,* Brown. & Lush. 221. 4 Fisher's Dig., 8223. 6 Mew's Fisher's Dig., 2038. There has not been any constitutional act done by the legislature repealing the act of August 12, 1758, or repealing, changing or annulling the contract in the said act contained. There has not been any agreement or contract between the State, or the legislature of the State, and the said Indians or their successors, in any way changing the contract in the act of August 12, 1758, exempting the lands purchased for the Indians from taxation.

Nor can this statute or contract be repealed or made of none effect by presumption. A presumption is an inference affirmative or disaffirmative of the truth or falsehood of any proposition or fact drawn by a process of probable reasoning in the absence of actual certainty of its truth or falsehood, or until such certainty can be ascertained. Best on Presumptions. Bouvier's Law Dict. Presumption. As above shown a statute can only be repealed by a statute, and cannot be repealed by a nonuser. A statute cannot alter by reason of time; the common law may. Dwarris' Maxims in Potter's Dwarris, 122. Presumption is against the repeal of a statute by implication. *The India,* 1 Brown. & Lush. 221. 6 Mew's Fisher's Dig., 2038.

Nor is this a case in which a presumption can arise. The cases referred to in the opinion of the Supreme Court of New Jersey in deciding this case will be found to depend upon the proof of title by custom or usage, ripening into prescriptive rights under the laws of England; and in all the cases where it was shown that such rights existed, or a grant had been made before the time of legal memory, the limitation under the laws of England, the grants were sustained and the rights then granted were sustained and enforced. Such cases can be of but little authority in this country, where there are no such prescriptive rights. This country was not discovered or settled until after the time "whereof the memory of man runneth not to the contrary," the limitation of prescriptive rights in England. In New Jersey it has been decided by its Supreme Court that there can be no title by prescription. *Ackerman* v. *Shelp*, 3 Halst. (8 N. J. L.) 125, 2d ed. 153. The effect of such citations is stated in 1 Dillon Munic. Corp., § 324; Cooley Const. Lim., 197; *Commonwealth* v. *Stodder*, 2 Cush. 562, 565, 569.

*Mr. Charles E. Hendrickson* for defendant in error.

*Mr. John P. Stockton*, Attorney-General of New Jersey, on behalf of the State, showed to the court that the case of *New Jersey* v. *Wilson*, 7 Cranch, 164, had been decided without argument, and on an incomplete statement of facts: that in 1796 a new contract had been made with the Indians in place of that of 1758, and that the new contract was not then before the court, and was now here for the first time for construction. He added: Respect for the decisions of this court as well as the doctrine of *stare decisis*, may prevent us from questioning the decision in the case of *New Jersey* v. *Wilson;* but it cannot close our eyes to the fact that the contract presented to and quoted by Chief Justice Marshall in *New Jersey* v. *Wilson*, differed materially from the actual document; nor to the equally important fact that that contract was, at that time, superseded and extinguished by another, then in existence, but undiscovered. The decision of Chief Justice Marshall, upon the facts stated in his

opinion, we do not question; but we insist that it cannot be possible that any maxim of law or reverence for authority compels this court to perpetuate an accidental error, which would make its ancient decisions and the opinion of its most distinguished jurists declare the law, on vital and constitutional questions, to be the reverse of the uniform rulings of the court, since 1830.

MR. JUSTICE BRADLEY, after stating the case as above reported, delivered the opinion of the court.

It appears from the record of the case of *New Jersey* v. *Wilson*, preserved in our files, that the act of 1796, authorizing the lands to be leased out, was not brought to the attention of this court. Whether, if it had been, it would have affected the judgment of this court is uncertain. It probably would not have done so; and we must assume it to be *res judicata* that in 1805 (when the case of *New Jersey* v. *Wilson* arose), the lands remained exempt from taxation in the hands of the purchasers.

We do not feel disposed to question the decision in *New Jersey* v. *Wilson*. It has been referred to and relied on in so many cases from the day of its rendition down to the present time, that it would cause a shock to our constitutional jurisprudence to disturb it now. If the question were a new one we might regard the reasoning of the New Jersey judges as entitled to a great deal of weight, especially since the emphatic declarations made by this court in *Providence Bank* v. *Billings*, 4 Pet. 514, and other cases, as to the necessity of having the clearest legislative expression in order to impair the taxing power of the State. See the cases collected in *Vicksburg &c. Railroad Co.* v. *Dennis*, 116 U. S. 665, 668.

The question, then, will be, whether the long acquiescence of the land owners under the imposition of taxes, raises a presumption that the exemption, which once existed, has been surrendered.

This question, by itself, would be a mere question of State municipal law, and would not involve any appeal to the Constitution or laws of the United States. But where it is charged

that the obligation of a contract has been impaired by a State law, as in this case by the general tax law of New Jersey as administered by the State authorities, and the State courts justify such impairment by the application of some general rule of law to the facts of the case, it is our duty to inquire whether the justification is well grounded. If it is not, the party is entitled to the benefit of the constitutional protection. *Murdock v. Memphis*, 20 Wall. 590, 636, Proposition 6.

We have carefully read the evidence in this case, and are satisfied that the lands were regularly assessed for taxes, and that the taxes were paid without objection from 1814, or about that time, down to 1876, the time of the assessment complained of—a period of sixty years. If an exemption from taxation can be lost in any case, by long acquiescence under the imposition of taxes, it would seem that an acquiescence of sixty years, and, indeed, a much shorter period, would be amply sufficient for this purpose, by raising a conclusive presumption of a surrender of the privilege. An easement may be lost by nonuser in twenty years, and even in a less time if it is affected by positive acts of invasion. A franchise may be lost in the same way, nonuser being one of the common grounds assigned as a cause of forfeiture. 3 Bl. Com. 262. Exemption from taxation being a special privilege granted by the government to an individual, either in gross, or as appurtenant to his freehold, is a franchise. Nonuser for sixty, or even thirty years, may well be regarded as presumptive proof of its abandonment or surrender. The present case is a strong one. The nonuser consists of acquiescence in actual taxation, or an actual invasion of the franchise, year by year, for a period of years reaching almost beyond the memory of man. It is not merely a case of nonuser, but one of disaffirmance of the privilege for this long period.

If the franchise were one which affected adversely the rights of other individuals, they might not be able to question its validity in a collateral proceeding. But it is set up against the government itself, whilst exercising one of its most important prerogatives. We see no reason why, in such a case, the government may not claim the benefit of lapse of time as a

ground of presumption of the surrender of the franchise, though the same period of nonuser would be a ground of forfeiture in a direct proceeding on the part of the State to revoke the franchise. We think the reasoning of the Supreme Court of New Jersey in this case is entirely satisfactory:

*The judgment is affirmed.*