**H. D. & J. K. CROSSWELL, Inc., v. JONES, Collector of Internal Revenue.**

District Court, E. D. South Carolina.
Oct. 2, 1931.

Adrian C. Humphreys and Newton K. Fox, both of New York City, and Thomas & Lumkin, of Columbia, S. C., for plaintiff.

Henry E. Davis, U. S. Atty., of Florence, S. C., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Charles K. Hoover and Charles T. Hendler, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., for defendant.

GLENN, District Judge.

The plaintiff, a corporation, has brought suit to recover income and excess profit taxes paid for the years 1918, 1919, and 1920. Pertinent provisions are sections 325, 326, 301, and 302 of the Revenue Act of 1918 (40 Stat. 1088, 1089, 1091, 1092). The facts have been stipulated, and there is no need to repeat most of them here. The question for decision is a very narrow one. The plaintiff originated as a partnership; this partnership had purchased certain contracts giving them rights of bottling and selling Coca-Cola in South Carolina. On March 1, 1915, the partnership incorporated itself under the laws of South Carolina with a capital stock of $5,000 par value. The stock of the corporation was issued to the partners and represented chiefly the value of the bottling contracts which the partnership had acquired. Further history of the dealings with the Commissioner of Internal Revenue involved the question of personal service classification as well as the question which is still before the court, namely, certain sections of the Rev-

enue Act of 1917 (40 Stat. 300). The Commission determined the matter against the plaintiff corporation, and the Tax Board affirmed the action of the Commission. See 6 B. T. A. 1315.

The deficiencies were thereafter assessed, together with interest, the same being paid by the plaintiff on December 16, 1927.

The plaintiff duly filed claims for refund of the taxes and interest paid, and, upon rejection thereof by the Commissioner of Internal Revenue, brought this suit.

Recovery is sought in this action on the ground that the plaintiff is entitled to have its invested capital increased for each of the years by reason of a claimed paid-in capital based on the value of the contracts acquired in 1915 for its capital stock of a par value of $5,000.

It is important at the outset to determine the nature of the contracts involved. All of the contracts are similar in nature, and the substance of these contracts is the privilege on the part of the plaintiff corporation to buy from the parent corporation Coca-Cola syrup at an agreed price. It then had a number of subcontracts with the local bottlers who repurchased the syrup from them at a substantial profit. As the country had grown greatly between 1903 and 1915, and as the use of Coca-Cola had steadily increased, it is readily seen that these contracts became very valuable, as a matter of fact, it is stipulated that the value of the principal contract on March 1, 1915, when it was transferred to the new corporation, was $162,000. In that the territory involved included several of the rapidly developing counties in the Piedmont section of South Carolina, the contracts had a very definite and substantial value. In 1917, 1918, and 1919 two enormous army camps were located in the territory involved. The amount of the taxes reflect the substantial value of these contracts.

The question turns around the application of subsection (a) of section 325 of the Revenue Act of 1918. It comes about in this way: Section 326, Revenue Act of 1918, provides that for the purposes of determining the invested capital of a corporation a sharp distinction is made between "tangible" and "intangible property." Section 326 then defines the term "invested capital." The rate of tax provided by section 301 depends upon the ratio of the net income to invested capital. Section 302 provides for the application of certain rates of tax to certain proportions of income, and invested capital is not a factor in the computation. The tax liability of the plaintiff corporation here has been determined under section 302. The plaintiff in this action contends that its invested capital so increased its basis of computation as to obviate the computation of the tax under section 302 and that the tax should have been determined under section 301. It follows, therefore, that the sole question presented for determination by this court may be summed up as follows: "Are the contracts acquired by the Plaintiff while a partnership and turned over to the Plaintiff a Corporation at the date of organization for capital stock in the Corporation tangible property or intangible property." Section 325, Revenue Act of 1918, defines the terms involved.

"Sec. 325. (a) That as used in this title—

"The term 'intangible property' means patents, copyrights, secret processes and formulae, good will, trade-marks, trade-brands, franchises, and other like property;

"The term 'tangible property' means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property."

It is very evident that, if we adopt a historical or scientific classification of property, these contracts must be held to be intangible. The difficulty arises by reason of the fact that the Revenue Act of 1918 repudiates the commonly accepted meanings of the words "tangible" and "intangible property," and sets up a classification by its own terms. The act practically says that the distinctions between tangible and intangible property which have been recognized by legal history and the science of jurisprudence are not satisfactory for revenue purposes. And therefore a new classification must be established. The government naturally contends that these contracts are intangible, and fall under the description "all other like property." The plaintiff contends that these contracts are not like the specific classes of property set out in the definition of intangible property, and that therefore they fall under the phrase "other property other than intangible property." In short, the plaintiff contends that the general language is used in the definition of tangible property, and before any type of property can come under the classification of intangible property it must be a patent, copyright, a secret process, formulæ, good will, trade-mark, trade-brand, franchise, or some property which possesses those characteristics similar to the list just enumerated. Undoubtedly, logic would re-

quire us to look first to the characteristic which is common to all of the terms used in the first part of the section. Unless the property under scrutiny possesses in a marked way the outstanding characteristics which are common to all of these classes of property, we could not say that it was "other like property." What, then, is the common characteristic of all of these terms? We think that the common characteristic is protection by some special statutes. For example, patents are protected by the statutes and government administration. Copyrights are likewise protected. So with secret processes and formulæ, which are in many cases required to be registered with state authorities. Good will has a definite and accepted meaning for taxation purposes well recognized by the law. Trade-marks and trade-brands are likewise protected by statute and principles of common law. In all of these is the element of governmental privilege and protection, and Congress must have had this idea in mind when grouping these terms together.

The government most earnestly contends, however, that these contracts are very similar to franchises, and that, as the word "franchise" is the last term used, the phrase "other like property" has a special reference to the term "franchise." We agree that the term "franchise" has been loosely applied to a few business relations which do not enjoy special government or legal protection. But the term "franchise" is used much more commonly and more accurately to describe special privileges granted by some governmental unit. This meaning of the word "franchise" has been recognized by the court. For example, we find a franchise defined:

" 'Franchise' is a word of extensive signification. It is a liberty or privilege. In England, under the common law, a franchise was a gem in the royal diadem. It was also a certain privilege inherent to the crown, and subsisted in the hands of a subject by grant from the King. It was therefore defined to be a 'royal privilege in the hands of a subject.' In this country the people not only have all the rights and privileges of English subjects, but they have secured all the rights and privileges of the crown. State v. City of Topeka, 2 P. 587, 589, 30 Kan. 657. * * *

"The ordinary signification of the word 'franchise,' as defined by Webster, is a particular privilege or right granted by a prince or sovereign to an individual or to a number of persons; an exemption from a burden or duty to which others are subject. Central R. & Banking Co. v. State, 54 Ga. 401, 409.

"A franchise is generally understood to be a special privilege emanating from the sovereign power of the state, owing its existence to a grant, or to prescription presupposing a grant. Board of Trade of Chicago v. People, 91 Ill. 80, 82; Chicago City R. Co. v. People, 73 Ill. 541, 547; Hazelton Boiler Co. v. Hazelton Tripod Boiler Co., 28 N. E. 248, 137 Ill. 231; State of New Jersey v. Wright, 6 S. Ct. 907, 908, 117 U. S. 648, 29 L. Ed. 1021; Lincoln St. Ry. Co. v. City of Lincoln, 84 N. W. 802, 808, 61 Neb. 109.

"A franchise is a grant of a right or privilege to an individual or a corporation by the government or sovereign power. [People of the] State [of New York] v. New York, L. E. & W. R. Co., 2 N. Y. Civ. Proc. R. 82, 89." Words and Phrases, First Series, Vol. 3, page 2929.

In the light of these considerations, let us examine these Coca-Cola contracts which are the ones here involved. The parent company has a secret process and formula, and we rather think that under the terms of the section involved this would be held to be intangible property. But the plaintiff corporation here has no such property. It simply has a contract entered into with another private corporation governing the sale and distribution of the protected product in a certain territory. The parent company has through some form of registration or compliance with the laws of the United States and of the state of incorporation protected its secret formula. This secret formula is then used for the manufacture of syrup which is distributed all over the nation. The contract between the plaintiff corporation and the parent company here enjoys no special protection. It differs not at all from all of the contracts of exclusive agency under which nearly all of the commodities of everyday use are distributed and sold. For example, it enjoys exactly the same protection under the law of the states involved and of the United States that a note evidencing a contract between two parties enjoys. Yet we find under the very definite language of section 325 a note is declared to be tangible property. For these reasons we conclude that the contracts under scrutiny do not fall under the terms used in defining intangible property, nor do they fall within the phrase "and other like property." The contracts do not possess that outstanding common characteristic which all of the specific terms used have in common.

So far we have stated the proposition as it occurs to us in our own way and have out-

lined our own reasoning thereon. Strangely, this specific provision of the act of 1918 does not seem to have been before the courts very much.

The Board of Tax Appeals itself has recognized that these contracts have a very substantial value much in excess of the nominal value attributed to them when the corporation was organized. In respect to this, the Board of Tax Appeals has said: " * * * By 1915, this contract had become very valuable, due to a large extent to the efforts of the partners, and could no doubt have been sold for a most substantial profit. Just what the actual value of the contract was at the time the same was turned in for stock we are unable to state. Only $5,000.00 of capital stock was issued for the contract and good will in 1915, whereas the contract alone had been purchased in 1903 for $5,500 cash. Between 1903 and 1915 the partners had netted substantial profits through the subcontracts which they had secured for bottling and selling of Coca-Cola in the territory covered by their principal contract. Their principal asset was the contract under which they were assigned the right to bottle and vend Coca-Cola. They did no bottling or vending of Coca-Cola themselves. Their services consisted in seeing that the contracts were carried out and in advertising and pushing bottled Coca-Cola. Such personal services as they rendered were for the purpose of further capitalizing their contract. Their profits were limited only to the extent which they were able to exploit the contract within their prescribed territorial limits. There can be no doubt, therefore, that this contract constituted capital, that it had value in 1915 much in excess of its original cost; and that it was a material income-producing factor."

The government and the plaintiffs have cited cases which refer to this matter indirectly. One of the reported opinions of the Board of Tax Appeals takes the same view which this court takes:

"In Reserve Natural Gas Company of Louisiana v. Commissioner, 15 B. T. A. 951, the Board of Tax Appeals held that a contract to purchase and sell natural gas was a tangible asset, and that the value of the contract in September, 1914, when it was paid in for stock of the company, should be included in invested capital at the value on the date paid in. The Board said:

" 'It is at once apparent that the above definition of the term "tangible property" includes classes of property which at common law would be classified as intangibles. Bou-

vier defines the term "tangible property" as follows: "That which may be felt or touched; it must necessarily be corporeal, but it may be real or personal." Thus we find that the common law concept of tangible property must to a large extent be disregarded. The statutory definition of "intangible property" includes only certain specified classes of property and "other like property." On the other hand the statutory definition of the term "tangible property" specifically includes certain classes of property which at common law would be termed intangible property. It further includes "other property other than intangible property." The term "tangible property" is the general term and the term "intangible property" is the exception.

" 'Before we can find that the contract involved is an intangible, we must find that it partakes of the nature of a patent, or of a copyright, or of a secret process or formula, or of good will, or of a trade-mark, or of a trade brand, or of a franchise. Gas can not be held to resemble any one of these classes of property. Nor does a contract to purchase and sell gas bear any resemblance to any one of the enumerated classes of intangible property.' "

The government relies largely upon the case of Bacon Coal Co. v. United States (D. C.) 34 F.(2d) 706. It is evident that this case does not control, for the following reasons:

"In the Bacon Coal Company Case, the Court held that the good will of the co-partnership and a certain contract made directly by the Plaintiff corporation with the Scranton and Lehigh Coal Company under the terms of which the latter agreed to deliver to the plaintiff 'all rail coal' and to extend a credit of $100,000, were intangible property. The contract was between the plaintiff corporation and the Scranton and Lehigh Company. It was not a contract made by the antecedent partnership with the Scranton and Lehigh Company and it was not paid into the plaintiff corporation by the partnership for capital stock.

"The real basis of the decision was the failure of the plaintiff to show that any property was paid in to the plaintiff corporation for stock or shares and the failure to prove any value for the contract. The Court said:

" 'There is no evidence that any of the intangible property was bona fide paid in other stock or shares at that time or later. * * *

" 'In fact, the contract is between the plaintiff and the Scranton & Lehigh Coal

884

Company, and no mention is made of the partnership. While $60,000 in preferred stock was issued, no evidence is adduced to show what it was issued for, or to whom. The evidence offered by the plaintiff does not show any cash value of the property even if it be assumed it was paid to the company. The evidence fails to show that the contract had any value.' Page 707 of 34 F.(2d).

"Furthermore, it was not shown that the contract was exclusive or that any other competitive dealer could not have purchased coal from the Scranton & Lehigh Coal Company under a similar contract for the same price. As to this the Court said:

"'There is no evidence that any other competitive dealer could not have purchased coal from the Scranton & Lehigh Coal Company for the same price. The contract states that the plaintiff will not buy from any other dealer, but does not state that the Scranton & Lehigh Coal Company will not deal with other competitors of the plaintiff.' Page 707 of 34 F.(2d).

"The case can be distinguished from the case at bar in the following particulars:

"1. The contract was not exclusive and therefore had no special or particular value.

"2. No value for the contract was proved by the evidence.

"3. The contract was between the plaintiff corporation and the coal company—and not with the antecedent partnership—and there was no proof and could be no proof that the contract was paid in by the partnership for stock of the plaintiff as the partnership was not a party to the contract.

"4. No proof of any sub-contracts between the Bacon Coal Company and third parties to sell the coal purchased from the Scranton & Lehigh Coal Company at a profit and no such sub-contracts were paid in by the partnership for stock of the plaintiff."

In the last analysis the case is one of lack of proof of value for the contracts, so that any construction of the definition of "tangible" and "intangible" property was not necessary to the decision and is purely obiter dicta. Under the facts there was no necessity for the court to construe the statute, and the court's construction is not supported by any cited rulings or decisions on invested capital or the meaning of "tangible" and "intangible" property.

In the Daily Pantagraph, Inc., v. United States Case (Ct. Cl.) 37 F.(2d) 783, the circulation structure of a newspaper was held to be "intangible" property on the ground that circulation is very much in the nature of "good will" that goes with every newspaper or periodical but yet cannot be touched or perceived. The court said: "We have no doubt that it is intangible property. It is something that goes with every newspaper or periodical, and yet it cannot be touched or perceived, although it may be described and to a certain extent specified. * * * Circulation is very much in the nature of good will. Its amount and value depend entirely on how attractive a publication is to the public, and whether they have such an opinion in regard to it that they are likely to continue their subscriptions and their advertising. Unlike tangible property, it cannot be parted or divided. It has all the characteristics that belong to other intangible property." Page 789 of 37 F.(2d).

But we think that the contracts here are very different from the circulation of a newspaper. The circulation is dependent entirely for its value upon good will. The new owners of the newspaper cannot go into a court and compel any subscriber to renew his subscription, but here the owners of the contract with the parent Coca-Cola Company could go into the courts and compel the delivery of a fixed gallonage at fixed prices.

It is likewise urged that the reasoning of the decision in La Belle Iron Works v. United States, 256 U. S. 387, 41 S. Ct. 528, 65 L. Ed. 998, supports the government's contention. This decision was construing the invested capital section of the Revenue Act of 1917 (40 Stat. 300, 306, § 207). There the Supreme Court did not allow the taxpayer to include in his invested capital the increased value of oil lands which increment had occurred after the corporation had acquired the lands. Here we are dealing with the real value, as agreed upon by the government, of contracts which had their increment before the corporation was ever organized and which were the "things of value" for which the original stock of the corporation was issued.

It seems to us that the reasoning of the La Belle Iron Works Case is favorable to the taxpayer here. After all the reason for putting the limitation on intangibles as invested capital was to prevent the taxpayers from attributing too great a value to that which was indefinite, visionary, and difficult of appraisal. The value of a patent, for example, is dependent upon many considerations which are indefinite. But these contracts had in our opinion a much more definite ascertainable value. They gave the owner the right to the royalties in fixed territories. The ulti-

mate product was a drink which had met with almost universal use in the territory involved. The books of the company enabled the plaintiff and the representatives of the government to see exactly how much the partnership had made out of these contracts.

The government has already determined that the plaintiff corporation is not a personal service corporation. The Board of Tax Appeals has said, with reference to this, that there can be no doubt that this contract constitutes capital, that it had value in 1915 much in excess of its original cost and that it was a material income-producing factor.

Finally, there is the familiar rule that doubts in regard to a taxing statute should be resolved in favor of the taxpayer. The government by the act of 1918 set up new criteria by which to distinguish between tangible and intangible property. For the purposes of this case we are confined to the meanings of these terms as set out in this section of the statute.

In that we cannot find that the contracts involved are patents, copyrights, secret processes, formulæ, good will, trade-marks, trade-brands, or franchises, nor that these contracts fall under the phrase "other like property," we are forced to the conclusion that for the purposes of taxation these contracts must be held to be tangible property.