867 A.2d 1222 (2005)
375 N.J. Super. 330
UNALACHTIGO BAND OF THE NANTICOKE-LENNI LENAPE[1] NATION and James Brent Thomas, Sr., Plaintiffs-Appellants,
v.
STATE of New Jersey and Donald Difrancesco, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 2005.
Decided February 28, 2005.
*1223 Andrew J. Bayne, Princeton, argued the cause for appellants (Bayne Law Group, attorneys; Mr. Bayne, of counsel and on the brief; Scott C. Walter and Brian P. Murphy, on the brief).
Michael J. Haas, Assistant Attorney General, argued the cause for respondents (Peter C. Harvey, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Mr. Haas, on the brief).
Before Judges LEFELT, FUENTES and FALCONE.
The opinion of the court was delivered by
LEFELT, J.A.D.
Plaintiffs, Unalachtigo Band of the Nanticoke Lenni Lenape Nation and James Brent Thomas,[2] their tribal chairperson and war chief, claimed to be direct descendents of those Native Americans who, after 1758, lived on the Brotherton Reservation in what is now Shamong Township, Burlington County. Plaintiffs asserted that when their ancestors sold the reservation land in 1801 and then sold the hunting and fishing rights in 1832, to New Jersey, the sales violated both (a) the 1758 Treaty with the Colony of New Jersey, which had established the Brotherton Reservation, and (b) the 1790 federal Indian Nonintercourse Act, 25 U.S.C.A. § 177, which prohibited the sale of Indian land without federal consent. Because of these violations, *1224 plaintiffs sought from defendants, State of New Jersey and the then acting governor, in accordance with the 1758 Treaty, exclusive use, occupancy and control, and the removal of "all non-Indian[s]" from the reservation.
Plaintiffs appeal from the trial court's dismissal of their complaint for lack of subject matter jurisdiction over the state and federal claims and for the absence of a Bureau of Indian Affairs (BIA) determination that the Unalachtigo Band constitutes an Indian tribe, directly descendent from those Indians who lived on the Brotherton reservation. We affirm the trial court's dismissal of plaintiffs' complaint and conclude that the federal courts have exclusive jurisdiction over plaintiffs' land claim.

I.
Here are the pertinent facts, reaching back to the earliest days of New Jersey's history, upon which plaintiffs rely to establish their claim. In 1758, in exchange for the cessation of hostilities between New Jersey's native peoples and its encroaching new citizenry, the Colony of New Jersey entered into the Treaty of Easton, which was ratified by an Act "[empowering] certain Persons to purchase the Claims of the Indians to Land in this Colony." Laws of the Royal Colony of New Jersey, 1746-1760, Vol.3, New Jersey Archives, 3rd Series 579 (1982) (hereinafter "Reservation Trust Act" or "Act").
The Act, which implemented the Treaty, authorized Commissioners to purchase the rights and claims "of all or any of the Indian Natives of this Colony" to the majority of lands South of the Raritan River. Ibid. In exchange for the Indians allowing the land to be purchased, the Act authorized the Commissioners to purchase a 3,044-acre reservation, which became known as the Brotherton reservation, and to hold the land in trust for the Indians living south of the Raritan River. Ibid. The Act specifically authorized the Commissioners to "take a Deed or Deeds ... in Trust for the Use of the said Indian Natives, who have or do reside in this Colony, South of the Rarit[a]n, and their Successors, forever." Ibid. The Act provided, however, that "it shall not be in the Power of the said Indians, or their Successors, or any of them, to lease or sell to any Person or Persons, any Part thereof." Ibid. The Act further prohibited non-Indians from settling on the reservation and authorized warrants for the removal of any non-Indians who settled on the reservation. Id. at 579-580. The Act further provided that "no Conveyance ... by the Indians, shall prejudice any Right they now have to hunt on any un[e]nclosed Lands, or fish in the Rivers and Bays of this Colony." Id. at 580.
The 3,044 acres were purchased in Evesham Township, now Shamong Township, in Burlington County. Approximately 100 to 200 Lenni Lenape began living on the Brotherton Reservation in tranquility, which continued for several years thereafter.
When New Jersey adopted its first Constitution in 1776, the Constitution continued all laws then in force, except those inconsistent with the new constitution. The existing laws, including the Reservation Trust Act, were to "remain in full force, until altered by the Legislature." N.J. Const. of 1776 art. XXI. The Legislature has never formally repealed the Act even after three revisions of our Constitution.
In 1796, however, the Indians living on the reservation convinced the Legislature to change the restrictive ownership provisions of the Act and appoint new commissioners to "take charge of the lands, and lease out the same, from time to time," as would be most conducive to the Indians. State of New Jersey v. Wright, 117 U.S. *1225 648, 651, 6 S.Ct. 907, 909, 29 L.Ed. 1021, 1023 (1886).
The record does not disclose the circumstances of any reservation leases that may have been executed, but some five years later, in 1801, a majority of the remaining Native Americans living on the reservation decided to move to New Stockbridge, New York, to join their relatives, and petitioned the New Jersey Assembly to sell their land.
This time, again at the Indians' request and with their consent, the Legislature passed a law that authorized the division of the reservation into farms for sale with the proceeds to be used for the Indians' trip to and settlement in New Stockbridge. L. 1801, c. 63. Pursuant to this law, the lands were sold, deeds of conveyance in fee-simple were given to the purchasers, and a group of Lenni Lenapes moved from the reservation to New Stockbridge. State of New Jersey v. Wright, supra, 117 U.S. at 651, 6 S.Ct. at 909, 29 L.Ed. at 1024.
In 1832, approximately forty of the remaining Native Americans who were living in New Stockbridge, asked their elderly chief, a Princeton College graduate, to obtain compensation from the New Jersey Legislature for their hunting and fishing rights under the Reservation Trust Act. William J. Allinson, ShawusKuKhKung (Wilted Grass-Bartholomew S. Calvin) at 5-6 (The Monmouth County Historical Ass'n 1920).
Upon the Chief's application, and even though the Legislature believed these rights had previously been sold in 1801, the Legislature awarded the Native Americans $2,000, which was considered to be "not large," but an act of "justice and kindness." Id. at 7. In thanking the Legislature for their kindness, the Chief extolled the relationship between New Jersey and the Native Americans living in the State by explaining that "[n]ot a drop of our blood have you spilled in battle  not an acre of our land have you taken but by our consent." Id. at 8.

II.
Having explicated the early history of plaintiffs' claim, we now detail the more modern occurrences leading to and including plaintiffs' suit. Long after all of the Indians who had resided in the Brotherton Reservation died, Governor Kean in 1989 acknowledged that the Lenni Lenape "were the people of the Brotherton Reservation, the first and only Indian reservation ever legally established in New Jersey." Letter of Recognition from Governor Thomas H. Kean (Oct. 20, 1989). The record, in this appeal, also contains certifications by two members of the Unilatchtigo Band of the Nanticoke Lenni Lenape Nation tracing their lineage to "the Southern Indians identified as the protected class of New Jersey residents envisioned by the Treaty and Act of 1758."
In September 1998, plaintiff Thomas incorporated the Nanticoke Lenni Lenape Tribal Nation[3] as a tribal government. In March 1999, he advised the BIA, in the *1226 United States Department of Interior, of the group's intent to seek federal recognition as an American Indian tribe.
In October 2001, plaintiffs sued the State and acting governor for "specific performance of the Treaty." Plaintiffs did not sue any of the existing landowners, but alleged that the State was obligated under the Treaty and Act "to remove any, and all non-Indians person or persons from [these] tracts of land."
In early 2002, at the urging of the trial court, plaintiffs again notified the BIA that they intended to petition for federal recognition. The BIA explained that, upon receipt of the documented petition, the BIA's Branch of Acknowledgment and Research would conduct a "technical assistance review" by a "research team comprised of a historian, an anthropologist, and a genealogist." No further BIA proceedings are in the record.
In dismissing plaintiffs' complaint, Judge Bookbinder concluded: "[t]his Court does not have subject matter jurisdiction over the issues raised by this case as they are the exclusive province of federal court." The judge believed that though plaintiffs couched their claim under the state common law, the actual claim is "that the State's purchase of the Brotherton Reservation is void because the Treaty of Easton established their rights to possession of the land and the treaty could only be overcome with consent of the United States." "Thus, [according to the trial court,] the Plaintiffs' ultimate claim is a violation of the Non-Intercourse Act." Judge Bookbinder therefore believed that "[p]laintiffs' complaint [was] based upon a federal right which would not exist absent federal legislation [, the Nonintercourse Act,] providing protection to Native Americans."

III.
About three years after New Jersey ratified the United States Constitution in 1787, the new federal government enacted the Nonintercourse Act, 25 U.S.C.A. § 177, which currently provides in pertinent part: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C.A. § 177. This statute was initially enacted in 1790, 1 Stat. 137, and "has remained the policy of the United States to this day." Oneida Indian Nation v. County of Oneida (Oneida I), 414 U.S. 661, 668, 94 S.Ct. 772, 777, 39 L.Ed.2d 73, 79 (1974).
The governmental purposes of the Nonintercourse Act were "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties," Fed. Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 119, 80 S.Ct. 543, 555, 4 L.Ed.2d 584, 598 (1960), and to prevent Indian unrest over encroachment by white settlers on Indian lands. Mohegan Tribe v. Connecticut, 638 F.2d 612, 621-22 (2d Cir.1980), cert. denied, 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981). The Nonintercourse Act protects only Indian tribes or nations, and not individual Indians, James v. Watt, 716 F.2d 71, 72 (1st Cir.1983), cert. denied, 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984), and creates "a trust relationship between the federal government and American Indian tribes with respect to tribal lands covered by the Act." Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 56 (2d Cir.1994) (the claim argued in Golden Hill is virtually identical to the claim pressed by plaintiffs).
*1227 Plaintiffs argue that the 1801 sale in this case was subject to the Nonintercourse Act, 25 U.S.C.A. § 177, and could not be completed without federal consent. Therefore, plaintiffs contend that all sales of reservation land from 1801 and thereafter were void because the federal government never consented. Under this theory, plaintiffs' right to possession of the Brotherton Reservation land would be "conferred by federal law, wholly independent of state law." Oneida I, supra, 414 U.S. at 666, 94 S.Ct. at 777, 39 L.Ed.2d at 78.
Because the Nonintercourse Act is a federal statute, the violation of which, according to plaintiffs, voids all of the reservation land sales, it would appear that federal courts have federal-question jurisdiction over this claim. Ibid. Plaintiffs may also have a federal common law right to maintain this action. County of Oneida v. Oneida Indian Nation (Oneida II), 470 U.S. 226, 236, 105 S.Ct. 1245, 1252, 84 L.Ed.2d 169, 180 (1985). Consequently, the federal courts clearly have subject matter jurisdiction over plaintiffs' claim.
Plaintiffs argue, however, that New Jersey courts also have subject matter jurisdiction. Gilbert v. Gladden, 87 N.J. 275, 280-81, 432 A.2d 1351 (1981) (subject matter jurisdiction provides a court with legal authority to decide a particular dispute). Plaintiffs point to our Constitution that invests the Superior Court with "original general jurisdiction throughout the State in all causes." N.J. Const. art. VI, § 3, ¶ 2. In addition, plaintiffs argue that "[a]bsent a controversy between two states or an express provision in a federal statute excluding concurrent jurisdiction... state courts may exercise jurisdiction over cases arising under federal law." Int'l Union of Operating Eng'rs, Local 68 v. Delaware River and Bay Auth., 147 N.J. 433, 441, 688 A.2d 569, cert. denied, 522 U.S. 861, 118 S.Ct. 165, 139 L.Ed.2d 108 (1997)(taking jurisdiction to construe a bi-state compact).
Plaintiffs therefore argue that "[t]he mere implication of a federal law in a state court claim does not in and of itself abrogate state court jurisdiction." They cite as support for this proposition, Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 275, 117 S.Ct. 2028, 2037, 138 L.Ed.2d 438, 452 (1997), which did state that "[i]nterpretation of federal law is the proprietary concern of state, as well as federal, courts." Idaho, however, bears no relationship to the dispute herein. Idaho did not involve an application of the Nonintercourse Act. That case was a common law quiet title action by which both the State and tribe claimed ownership to the banks and submerged lands of a lake that was within the boundaries of the tribe's reservation. That is very different from our situation where plaintiffs argue that they are entitled to specific performance of a colonial treaty because of an 1801 violation of the Nonintercourse Act.

IV.
We begin our explanation of why New Jersey lacks subject matter jurisdiction over this claim by recognizing that Article 1 of the United States Constitution empowers Congress with the sole authority to regulate commerce with Indians. U.S. Const. art. 1, § 8, cl. 3. See Montana v. Blackfeet Tribe, 471 U.S. 759, 764, 105 S.Ct. 2399, 2401, 85 L.Ed.2d 753, 758 (1985)("The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes.").
The United States Supreme Court explained in Oneida I that "[o]nce the United States was organized and the Constitution adopted ... tribal rights to Indian lands became the exclusive province of the federal law. Indian title ... was extinguishable only by the United States." 414 U.S. at *1228 667, 94 S.Ct. at 777, 39 L.Ed.2d at 79. It is the very Nonintercourse Act, upon which plaintiffs rely, through which Congress "asserted the primacy of federal law." Ibid.
In addition, this federal protection of Indian occupancy applies in the original thirteen states even though they, and not the United States, held fee title to Indian land located within them. 414 U.S. at 670, 94 S.Ct. at 778-79, 39 L.Ed.2d at 80-81. The fact that land in the original thirteen states, including New Jersey, was owned in fee by the State "did not alter the doctrine that federal law, treaties and statutes protected Indian occupancy and that its termination was exclusively the province of federal law." 414 U.S. at 670, 94 S.Ct. at 779, 39 L.Ed.2d at 81.
"The state courts acquire jurisdiction over [Indian land] disputes only to the extent that Congress explicitly provides." State of Alaska, Dept. of Pub. Works v. Agli, 472 F.Supp. 70, 72 (D.Alaska 1979). Thus, the general rule is that the "consent of Congress is required for state courts to exercise jurisdiction over Indian territory." Hamilton v. MacDonald, 503 F.2d 1138, 1150 (9th Cir.1974).
"The predominance of the federal government in Indian affairs is nowhere more pronounced than in the field of Indian property law." Boisclair v. Superior Court, 51 Cal.3d 1140, 276 Cal.Rptr. 62, 801 P.2d 305, 309 (1990). Although the federal government provided in 28 U.S.C.A. § 1360(a), that six states (California, Minnesota, Nebraska, Oregon, Wisconsin and Alaska) were to have jurisdiction over certain civil actions involving Indians, the jurisdiction was limited by 28 U.S.C.A. § 1360(b)'s prohibition against these six states assuming jurisdiction over Indian land claims.
Congress specifically provided that "[n]othing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, ... belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States." 28 U.S.C.A. § 1360(b). This provision was "simply a reaffirmation of the existing reservation Indian-Federal Government relationship." Bryan v. Itasca County, 426 U.S. 373, 391, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710, 723 (1976). And significantly for this case, § 1360(b) applies to land "subject to a restriction against alienation imposed by the United States," such as the Nonintercourse Act.
Under the existing relationship, no state, even those specifically mentioned in 28 U.S.C.A. § 1360(a) could assume jurisdiction over Indian land claims. Section 1360(b) affirmatively prohibited state courts from "applying state laws or enforcing judgments in ways that would effectively result in the `alienation, encumbrance, or taxation' of trust property." Bryan, supra, 426 U.S. at 391, 96 S.Ct. at 2112, 48 L.Ed.2d at 722.
In 1968, Congress enacted 25 U.S.C.A. §§ 1321 and 1322, which authorize states that did not already have jurisdiction over criminal and civil actions involving Indians to assume such jurisdiction with the consent of the tribe affected. New Jersey did not assume Indian jurisdiction under these laws, but both of these statutes contain a subsection (b), which, like 28 U.S.C.A. § 1360(b), and its counterpart for criminal jurisdiction, 18 U.S.C.A. § 1162(b), provides that it shall not authorize the alienation of any real property belonging to any Indian tribe that is subject to a restriction against alienation.
Congress has therefore not been silent regarding jurisdiction over claims involving real property belonging to Indian tribes that is subject to a federal restriction against alienation. Congress has *1229 repeatedly announced that such claims are exempt from state jurisdiction. 28 U.S.C.A. § 1360(b), 18 U.S.C.A. § 1162(b), 25 U.S.C.A. § 1321(b), and 25 U.S.C.A. § 1322(b).
We derive from these statutes a clear understanding that Congress expressly intended to preserve exclusive federal jurisdiction over claims to Indian land, which is subject to restriction against alienation. See McKay v. Kalyton, 204 U.S. 458, 469, 27 S.Ct. 346, 350, 51 L.Ed. 566, 571 (1907)(state court did not have jurisdiction to decide who was the proper heir to an allotment of land to an Indian, located on a reservation, which the United States held in trust). "Where a dispute involves trust or restricted property, the state may not adjudicate the dispute nor may its laws apply." Alaska v. Agli, supra, 472 F.Supp. at 73 (quoting In re Humboldt Fir, Inc., 426 F.Supp. 292, 296 (N.D.Cal.1977)).
It seems to us that plaintiffs' federal claim turns crucially on the proper construction and implementation of the Nonintercourse Act, which "does not speak directly to the question of remedies for unlawful conveyances of Indian land." Oneida II, supra, 470 U.S. at 237, 105 S.Ct. at 1253, 84 L.Ed.2d at 180. We are confident that Congress has preempted claims to Indian land subject to restriction against alienation, and that state court jurisdiction over such claims could frustrate the federal protection established by the Nonintercourse Act, which was one of the means by which the federal government sought "to secure the economic well being and tribal autonomy of native Americans." Boisclair, supra, 276 Cal.Rptr. 62, 801 P.2d at 310.
"As long as the Indian party to the litigation claims that the property is Indian trust or allotted land, the dispute may be characterized as one concerning ownership and possession of Indian land, and is therefore barred from state court jurisdiction." Id. at 314. "[T]he exclusive federal-Indian trust relationship is best maintained by channeling all disputes about such land into federal court." Id. at 311; see e.g., Tafflin v. Levitt, 493 U.S. 455, 459-60, 110 S.Ct. 792, 795, 107 L.Ed.2d 887 (1990) ("Th[e] deeply rooted presumption in favor of concurrent state court jurisdiction is, of course, rebutted if Congress affirmatively ousts the state courts of jurisdiction.... `by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests.'").
The proper forum for plaintiffs to advance their Non-intercourse claim is exclusively the federal courts. Consequently, we conclude that New Jersey lacks subject matter jurisdiction, and the trial court correctly dismissed plaintiffs' complaint on that basis.

V.
Although we conclude that New Jersey lacks subject matter jurisdiction, we address the State claim. New Jersey has a strong interest in the issues being advanced by plaintiffs. The Reservation had been held in trust by this State, and New Jersey's long relationship with the Native Americans living within its borders precedes the formation of the federal government. Not only is the interpretation of some of our earliest laws involved in this dispute, but also, should plaintiffs' claim ultimately succeed, countless land deals for over two centuries having no connection with any wrong perpetrated upon Indians, would be jeopardized.
Plaintiffs specifically argue that the Treaty of 1758, as implemented in the Reservation Trust Act, remains an enforceable contract between the State and "the Indian people of New Jersey" because the Act was never repealed. Consequently, *1230 plaintiffs argue that they are entitled to specific performance of this contract under State law.
There is United States Supreme Court support for the Treaty and Act constituting a contract between the State of New Jersey and those Indians who took up residence on the Brotherton Reservation. State of New Jersey v. Wilson, 11 U.S. 164, 166-67, 7 Cranch 164, 166-67, 3 L.Ed. 303, 303-04 (1812). Besides establishing the reservation and precluding the Indians from making future sales or leases of their interests in the reservation land, the Act also provided that the reservation land would be exempt from tax. The Court in Wilson considered whether the Act constituted a contract and whether the contract was violated by a subsequent Act by the New Jersey Legislature in 1804, which repealed the tax exemption.
In considering these questions, the Court noted that "[e]very requisite to the formation of a contract is found in the proceedings between the then colony of New Jersey and the Indians," and concluded that "[t]his is certainly a contract clothed in forms of unusual solemnity." Ibid.
In defense against plaintiffs' State contract claim in this case, the State argues that even if the 1758 Act is a contract, it "is no longer `in force;' its purposes were completely fulfilled almost two centuries ago. In other words, if the 1758 Act is `valid,' so is the 1801 Act that permitted the [sale of the reservation land]. There is simply nothing left to `enforce.'" In essence, the State contends that the contract, which constituted the 1758 Act, between the Indians and the State was modified by the 1801 sale of the reservation land.
Indeed, that seems to be the uncontested fact. In 1801, both parties to the contract agreed, for valuable consideration, to rescind the following two portions of the contract: (1) providing "it shall not be in the power of the said Indians, or their Successors," to sell any part of their interest in the land, and (2) providing that the Commissioners would hold the reservation in trust for the Indians and their successors, forever. Laws of the Royal Colony of New Jersey, supra, at 579.
Because the 1758 Act was a contract, under State law the parties may modify, abrogate, or rescind it. County of Morris v. Fauver, 153 N.J. 80, 95, 707 A.2d 958 (1998). Both parties must clearly assent to the change, and consideration is generally required. Id. at 96 and 99-100, 707 A.2d 958; Oscar v. Simeonidis, 352 N.J.Super. 476, 484, 800 A.2d 271 (App.Div.2002). There is no question here that the Lenni Lenape not only assented to the sale of their land, but requested it, and the record reflects that they received full value, without any deception or overreaching.
"[W]hen, at the request of the Indians, the land was sold to other parties in fee-simple absolute, the abnormal qualities of Indian tenure were extinguished." State of New Jersey v. Wright, supra, 117 U.S. at 652-655, 6 S.Ct. at 910-911, 29 L.Ed. at 1023 (1886). The Act of 1801, L. 1801, c. 63, in effect rescinded the conflicting provisions of the 1758 Act, and modified the land rights associated with the reservation to permit the reservation to be subdivided and sold to non-Indians.
The provisions at issue do not exist any longer; at least under State contract law without considering the impact of the federal Nonintercourse Act. Only by application of the federal restraint on the 1801 reservation sale, does plaintiffs' specific performance State claim achieve potential viability. In the absence of any federal restraint, plaintiffs would not be entitled to specific performance of the 1758 Act.

*1231 VI.
We also believe that before proceeding in the federal court on its Nonintercourse Act claim, plaintiffs should first obtain a determination from the BIA that the Unalachtigo Band constitutes an Indian tribe directly descendent from the tribe of Indians who lived on the Brotherton Reservation. See Golden Hill Paugussett Tribe, supra, 39 F.3d at 56.
The primary jurisdiction doctrine permits courts to defer to the jurisdiction of an administrative agency, such as the BIA, for "the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." Golden Hill, supra, 39 F.3d at 58-59. Such deference fosters "consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and [also permits] the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims." Id. at 59; see also Alliance For Disabled In Action, Inc. v. Continental Props., 371 N.J.Super. 398, 408, 853 A.2d 328 (App.Div.2004); Richardson v. Standard Guar. Ins. Co., 371 N.J.Super. 449, 475, 853 A.2d 955 (App.Div.2004).
In this case, there is no question that the BIA has experience and expertise regarding the threshold issue involved in this case. Golden Hill, supra, 39 F.3d at 59-60. The Unalachtigo commenced proceedings in the BIA by announcing their intent to file a petition for recognition. Whether plaintiffs are the Indian tribe descendents of the beneficiaries of the Treaty of 1758 is a fact issue within the special competence of the BIA.
Deferral to the BIA will also promote uniformity and consistency. Plaintiffs' petition will be reviewed in conjunction with the petitions of other New Jersey Indian groups. The Nanticoke Lenni Lenape Indians of New Jersey, Inc., for example, have also advised the BIA of their intention to file a petition for federal recognition.[4] The BIA has already denied recognition to New Jersey's Ramapough Mountain Indians because the Ramapough failed to document their tribal descent from the Lenni Lenape. Ramapough Mountain Indians v. Norton, 25 Fed. Appx. 2, 3, 2001 WL 1699413, *1 (D.C.Cir.2001), cert. denied, 537 U.S. 817, 123 S.Ct. 87, 154 L.Ed.2d 22 (2002).
Because we have chosen to affirm the dismissal of plaintiffs' complaint, however, notwithstanding the foregoing observations, we elect not to decide the primary jurisdiction issue and, instead, defer to the federal interest in deciding that issue. Should plaintiffs pursue their claim in federal court, the primary jurisdiction question will be a concern of that forum, which should have the opportunity to decide the issue without interference by this court. Accordingly, we expressly decline to decide the primary jurisdiction issue.
Affirmed.
NOTES
[1] Incorrectly referred to as "Lenni Lenni" in the complaint.
[2] In its brief, the State attacked Thomas's character. We found this attack to be offensive, unwarranted, and irrelevant.
[3] The Nanticoke Lenni Lenape Indians of New Jersey, which had been organized in 1976 and incorporated in 1982, filed a complaint against plaintiffs in federal District Court alleging unfair competition and service mark infringement. The Lenni Lenape Indians of New Jersey claimed approximately 900 members, not including Thomas, in five states and representation on the New Jersey Commission on Native American Affairs (now called Commission on American Indian Affairs, L. 2001, c. 295, § 1). The Lenni Lenape Indians of New Jersey alleged that plaintiffs' activities were causing confusion and mistake, together with damage to the reputation and good will of the Nanticoke Lenni-Lenape Indians of New Jersey, Inc. The record does not contain any further information on this litigation, though we were informed at oral argument that the dispute has been settled.
[4] The record does not reflect whether New Jersey's Powhatan Renape Nation has also sought recognition from the BIA. Two members of the Powhatan Renape Nation, Nanticoke Lenni Lenape Indians, and the Ramapough Mountain Indians, serve on New Jersey's Commission on American Indian Affairs. N.J.S.A. 52:16A-53.