**GOLDEN HILL PAUGUSSETT TRIBE OF INDIANS, et al.**

v.

**Lowell P. WEICKER, Jr., et al.**

**No. 2:92CV00738 (PCD).**

United States District Court, D. Connecticut.

July 21, 1993.

Michael D. O'Connell, O'Connell, Flaherty & Attmore, Hartford, CT, David Michael Tilles, Rome, Case, Kennelly & Klebanoff, Bloomfield, CT, Martin D. Wheeler, Connecticut Legal Services, Middletown, CT, William A. Wechsler, Bailey & Wechsler, Hartford, CT, Bernard Wishnia, Roseland, NJ, for Golden Hill Paugussett Tribe of Indians.

David Michael Tilles, Rome, Case, Kennelly & Klebanoff, Bloomfield, CT, Martin D. Wheeler, Connecticut Legal Services, Middletown, CT, William A. Wechsler, Bailey & Wechsler, Hartford, CT, Bernard Wishnia, Roseland, NJ, for Aurelilus H. Piper, Jr., Moonface Bear.

William A. Wechsler, Bailey & Wechsler, Hartford, CT, Bernard Wishnia, Roseland, NJ, for Ethel Sherman Piper Baldwin Peters.

Charles H. Benson, Daniel R. Schaefer, Atty. General's Office, Sp. Litigation, Richard Blumenthal, Atty. General's Office, Admin. Dept., Hartford, CT, for Lowell P. Weicker, Jr.

Mark T. Anastasi, Office of the City Atty., Bridgeport, CT, for Joseph Ganim.

Henry C. Winiarski, Jr., Hartford, CT, Allan van Gestel, Goodwin, Procter & Hoar, Boston, MA, for Hoffman Fuel Co.

Richard L. Albrecht, Alexander H. Schwartz, Cohen & Wolf, P.C., Bridgeport, CT, for Merrill Lynch Interfunding, Inc., Alfred Marini, Sr., Alfred Marini, Jr., Luigi Constantini, Fernando Constantini, Kanuel F. Ferreia.

Mark Richard Kravitz, Noel E. Hanf, Wiggin & Dana, New Haven, CT, for United Illuminating Co.

Richard S. Lipman, Thomas A. Gugliotti, Schatz & Schatz, Ribicoff & Kotkin, Hartford, CT, for Lafayette Bank & Trust Co., Anthony Julian R.R. Const. Co.

Richard L. Albrecht, Alexander H. Schwartz, Austin K. Wolf, Cohen & Wolf, P.C., Bridgeport, CT, for Costal Pallet Corp.

Geoffrey A. Hecht, Virshup, Caplan & Hecht, New Haven, CT, Richard L. Albrecht, Alexander H. Schwartz, Austin K. Wolf, Co-

hen & Wolf, P.C., Bridgeport, CT, for Peter G. Standish, Christine M. Smilee.

Geoffrey A. Hecht, Virshup, Caplan & Hecht, New Haven, CT, John Pirina, Jr., Union Trust Co., Legal Dept., Shelton, CT, for Union Trust Co.

Janet L. Janczewski, The Southern Connecticut Gas Co., Bridgeport, CT, for Southern Connecticut Gas Co.

Richard J. Buturla, Robert L. Berchem, John J. Kelly, Jr., Berchem, Moses & Devlin, P.C., Milford, CT, for Daddario Industries.

Richard S. Lipman, Schatz & Schatz, Ribicoff & Kotkin, Hartford, CT, for Dominick Julian.

Carl J. Schuman, U.S. Attorney's Office, Hartford, CT, Andrew M. Eschen, U.S. Dept. of Justice, Washington, DC, for U.S.

Heidi Cornish, Hunt, Leibert, Chester & Pontacoloni, P.C., Hartford, CT, for Rita Lipton.

## RULING ON PENDING MOTIONS

DORSEY, District Judge.

Plaintiffs Golden Hill Paugussett Tribe of Indians and individuals claiming tribe membership have sued pursuant to the Indian Nonintercourse Act, 25 U.S.C. § 177, and the Proclamation of 1763 by King George III of Great Britain, against holders of record title to certain land in Bridgeport, Connecticut. Defendants move to dismiss for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).

### I. *Background*

Plaintiffs' allegations are that since time immemorial and until the acts complained of here, the Golden Hill Paugussett Tribe of Indians ("the Tribe") exclusively owned, used, and occupied much of the southwestern part of the state of Connecticut prior to the arrival of European colonists during the seventeenth century. English colonists began to settle in the area in 1638. In 1659, a dispute between the colonists and the Tribe was settled by creating the first Indian reservation in Connecticut, an eighty-acre territory which became known as the Golden Hill reservation, located within modern-day Bridgeport.

Allegedly by 1760, settler encroachment had reduced the size of the reservation, prompting a petition by the Tribe to the Assembly of the Colony of Connecticut. In 1765, that dispute was resolved by allowing the settlers to keep sixty-eight acres of the reservation, but giving to the Tribe the remaining twelve acres, known as the "Nimrod lot," and eight additional acres known as the "Rocky Hill lot."

An act of the Connecticut General Assembly in 1802 purported to sell the Nimrod lot and the Rocky Hill lot on behalf of the Tribe, without the consent or approval of the United States. At later points during the nineteenth century, several overseers of the Tribe conveyed tribal property in Bridgeport, without the consent or approval of the United States.

### II. *Discussion*

#### A. *Nonintercourse Act*

The Constitution of the United States, ratified in 1789, gave Congress the power "to regulate commerce with foreign Nations, and among the several states, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. On July 22, 1790, Congress adopted the first Indian Nonintercourse Act, 1 Stat. 137, 138, which was modified slightly and reenacted in 1793, 1796, 1799, 1802 and 1834. The Nonintercourse Act nullified any conveyance of Indian tribal lands without the consent of Congress.

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. This section has been in force in substantially the same terms since 1790. The sale of the Nimrod and Rocky Hill lots in 1802 without the consent of the United States violated its terms.

Article III of the United States Constitution limits the jurisdiction of federal courts to the adjudication of "cases" and "controversies." U.S. Const., Art. III. The case or

controversy requirement mandates that the plaintiff have standing to initiate the action. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The absence of standing deprives the court of subject matter jurisdiction. Whether the plaintiff has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Id.*

 The protection afforded by the Nonintercourse Act is limited to "Indian nation[s]" and "tribe[s] of Indians." 25 U.S.C. § 177. Hence, in order for a claim to be cognizable under that Act, plaintiff must show, among other factors, that it is or represents an Indian tribe. *Epps v. Andrus,* 611 F.2d 915, 918 (1st Cir.1979); *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575 (1st Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); *Narragansett Tribe v. Southern Rhode Island Land Devel. Corp.,* 418 F.Supp. 798, 803 (D.R.I. 1976). Neither individual Indians, nor groups of Indians that possess no tribal status, have standing to sue for tribal land under the Nonintercourse Act. *Epps,* 611 F.2d at 918; *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 537–38 (N.D.N.Y.1977), *aff'd,* 719 F.2d 525 (2d Cir. 1983), *aff'd in part and rev'd in part,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

Plaintiffs concede that the individually named plaintiffs lack standing to assert claims under the Nonintercourse Act. As plaintiffs have no objection to dismissal of that portion of the amended complaint in which Aurelius Piper, Jr., Moonface Bear, and Ethel Sherman Piper Baldwin Peters are named individually as plaintiffs, that portion of the amended complaint is dismissed. *See* Memorandum in Response to Motion by Defendant Hoffman Fuel Co. to Dismiss, May 7, 1993, at 1–2.

 The question remains whether the Paugussett Tribe has standing to sue under the Nonintercourse Act. Defendants argue that plaintiff is not a tribe and has no standing under the Nonintercourse Act absent federal acknowledgment (recognition) by the Bureau of Indian Affairs of the Department of the Interior. The Paugussett Tribe is not federally recognized; its petition for federal recognition is currently pending.

Congress has authorized the executive branch to prescribe regulations concerning Indian affairs. *See* 25 U.S.C. §§ 2, 9. The Department of the Interior (DOI) has promulgated regulations establishing procedures for recognition of Indian tribes. *See* 25 C.F.R. § 83. Any Indian group not previously acknowledged by DOI may apply for recognition. A tribe recognized as such is entitled to federal protection, services, and benefits. 25 C.F.R. § 83.2. A petition for recognition is a prerequisite to acknowledgment. *See* 25 C.F.R. §§ 83.4, 83.7.

It has been held that recognition of tribal status is not required for a tribe to be able to invoke the Nonintercourse Act. *See Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899, 902 (D.Mass.1977) (tribal status absent federal recognition is an adjudicative fact); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, 655–56 (D.Me.), *aff'd,* 528 F.2d 370, 376–77 (1st Cir. 1975) (absence of federal recognition does not exclude stipulated tribe from Nonintercourse Act); *Narragansett,* 418 F.Supp. at 808 (rejecting argument that only federally recognized tribes are protected by Nonintercourse Act); *Mohegan Tribe v. State of Connecticut,* Civil No. H–77–434, Ruling on Motion for Summary Judgment (D.Conn. Apr. 11, 1984) (absence of federal recognition is not conclusive).

In both *Narragansett* and *Passamaquoddy,* the plaintiffs were stipulated to be a tribe. *See Narragansett,* 418 F.Supp. at 808; *Passamaquoddy,* 528 F.2d at 376–77 ("there is no reason why the Passamaquoddy Tribe should be excluded [from Nonintercourse Act protection] since it is stipulated to be a tribe racially and culturally"). In *Narragansett* and *Passamaquoddy,* the stipulation in effect precluded any viable argument over plaintiff's standing under the Nonintercourse Act. Plaintiff's tribal status here is disputed.

In *Mashpee*, the district court held that whether a tribe meets the criteria for protection under the Nonintercourse Act is "a question of fact which is susceptible of proof like any other," *Mashpee*, 427 F.Supp. at 903, and that a court may determine whether a given group constitutes a tribe by applying the definition in *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901) where the Supreme Court defined a "tribe" as:

a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory.

*Id. See United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926).

In *Mashpee*, the First Circuit explicitly warned that its holding must be interpreted in light of historical context. At that time, the DOI did "not yet have prescribed procedures and ha[d] not been called on to develop special expertise in distinguishing tribes from other groups of Indians." *Mashpee*, 592 F.2d at 581. Specifically because no final regulations had been issued, the First Circuit held that the district court correctly refused to grant a continuance pending administrative action. *Id.* Though the question of tribal status did not require deference to administrative expertise in that case, the court cautioned that:

in another case, once the Department has finally approved its regulations and developed special expertise through applying them, we might arrive at a different answer.

Recent decisions have shown that a different answer, presaged by the *Mashpee* decision, is now appropriate. *See James v. United States Dept. of Health & Human Serv.*, 824 F.2d 1132 (D.C.Cir.1987). In *James*, a faction of an unrecognized Indian tribe sought an order that the DOI add it to the list of federally recognized tribes. Plaintiffs were held to be required to exhaust administrative procedures for tribal recognition by the DOI prior to judicial involvement. The court reviewed *Mashpee* and noted that by 1987, 10 years after *Mashpee*, the DOI had

been implementing its regulations and had developed significant expertise, warranting a different conclusion. *See id.* at 1138.

In general, a litigant must exhaust all administrative remedies before seeking judicial relief:

The rationale behind the exhaustion doctrine is that a court's refusal to intervene prematurely in the administrative process gives the agency an opportunity to develop factual findings, to apply its expertise to new issues and to exercise its discretionary powers.

*Touche Ross & Co. v. SEC*, 609 F.2d 570, 574 (2d Cir.1979), citing *McKart v. United States*, 395 U.S. 185, 193–94, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969). *See also Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938). In accordance with notions of administrative autonomy, exhaustion protects the integrity of the administrative process and prevents litigants from flouting agency procedures. *Touche Ross*, 609 F.2d at 574. Regarding questions of Indian tribal status, the Supreme Court has noted:

it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs.

*United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1866).

The interest in requiring exhaustion of the procedures established by the DOI is particularly strong here. Court decisions regarding which groups of Indians constitute tribes for Nonintercourse Act purposes would undoubtedly encourage avoiding of the DOI's processes, impede uniformity, and multiply proceedings. The multifaceted question of tribal recognition is best considered in terms of flexible fact-finding procedures of agencies not limited by Article III. *See Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 69, 91 S.Ct. 203, 208, 27 L.Ed.2d 203 (1970).

Exhaustion will enable the DOI to apply its expertise in the area of Indian tribal determinations. The Bureau of Indian Affairs (BIA) employs historians, anthropolo-

gists, and genealogists, *James*, 824 F.2d at 1138, and has evaluated at least 143 petitions for recognition. *See* Branch of Acknowledgment & Research, *Summary Status of Acknowledgment Cases* (May 1993). "It cannot be denied that the BIA has special expertise and extensive experience in dealing with Indian affairs." *Runs After v. United States*, 766 F.2d 347, 352 (8th Cir.1985). Plaintiff argues that the BIA was not established to adjudicate land claims and maintains no special expertise in that regard. *See* Plaintiff's Reply Brief Relative to Issues of Standing, June 18, 1993, at 4. However, the present relevant issue is plaintiff's standing to assert a claim under the Nonintercourse Act, not the validity of the underlying land claim itself. *See, e.g., Mashpee*, 427 F.Supp. at 902–03.

Whether a group of Indians constitutes a tribe lies at the heart of the task assigned by Congress to the DOI. *See Chicago Mercantile Exch. v. Deaktor*, 414 U.S. 113, 114–15, 94 S.Ct. 466, 466–67, 38 L.Ed.2d 344 (1973); *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973). The purpose of the regulatory scheme established by the Secretary of the Interior is to determine which Indian groups warrant recognition as tribes. *See* 25 C.F.R. § 83.2. That inquiry is extremely intricate and technical, *see Deaktor*, 414 U.S. at 115, 94 S.Ct. at 466; *Ricci*, 409 U.S. at 305, 93 S.Ct. at 582, involving extensive and diverse historical, anthropological, and genealogical evidence reaching back more than three centuries.[1] Requiring exhaustion is appropriate because a determination that plaintiff constitutes a tribe would implicate the "somewhat anomalous and complex relationship between the quasi-sovereign Indian tribes and the federal government." *Runs After*, 766 F.2d at 352. These factors and BIA's administrative superiority in gathering the relevant facts and in marshaling them into a meaning-

ful pattern, *see Federal Maritime Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 498, 78 S.Ct. 851, 861, 2 L.Ed.2d 926 (1958), oblige deferral of the question of plaintiff's recognition as a tribe to the BIA for determination. Congress's delegation of authority, the regulations adopted in implementation thereof, and BIA's development of expertise appropriate thereto, amply demonstrate a scheme for determination of tribal status intended and best left at first blush to the BIA.

### B. *Proclamation of 1763*

On October 7, 1763, King George III of Great Britain issued a proclamation which provided in pertinent part:

> And whereas great frauds and abuses have been committed in the purchasing lands of the [American] Indians, to the great prejudice of our interests, and to the great dissatisfaction of the said Indians.... we do ... strictly enjoin and require, that no private person do presume to make any purchase from the said Indians of any lands reserved to the said Indians within those parts of our colonies where we have thought proper to allow settlement; but that if at any time any of the said Indians should be inclined to dispose of the said lands, the same shall be purchased only for us, in our name....

Proclamation of 1763 (Oct. 7, 1763), reprinted in 3 W.E. Washburn, *The American Indian & The United States: A Documentary History* 2135, 2138 (1973). Plaintiff claims that the alienation of sixty-eight acres from the Paugussett Tribe in 1765 without the consent of George III violated this proclamation.

Statutory interpretation and historical analysis suggest that the Proclamation of 1763 was not intended to apply east of the Appalachian Mountains. Pursuant to the Treaty of Paris signed on February 10, 1763, following British victory over France and

---

1. The *Mashpee* case, where the question of tribal status went to a jury, lends credence to the conclusion that the adversarial process is not conducive to the inquiry at issue. During the forty-day trial, conflicting evidence was presented by historians, political scientists, anthropologists, curators, sociologists, and genealogists. Although the jury was instructed as a matter of law that tribal status, once abandoned, could not be revived, after two days of deliberation the jury found that the Mashpee were not a tribe in 1790 when the first Nonintercourse Act was passed, but were a tribe from 1834 through 1842. *See Mashpee*, 592 F.2d at 579–80. *See generally* the discussion of the Mashpee in P. Brodeur, *Restitution: The Land Claims of the Mashpee, Passamaquoddy and Penobscot Indians of New England* (1985).

Spain in the Seven Years' War, Great Britain acquired control of all of North America east of the Mississippi River. The drafters of the Proclamation were exclusively concerned with the newly acquired territory. *See* L.H. Gipson, *The Triumphant Empire: New Responsibilities Within the Enlarged Empire, 1763–1766*, at 43–54 (1956). The text of the Proclamation reflects this concern, declaring that all lands "lying to the westward of the sources of the rivers which fall into the sea from the west and northwest" should be reserved for the use of the Indians. Proclamation of 1763, in Washburn, *The American Indian* at 2137.

In the Proclamation of 1763, King George III attempted to separate the Atlantic seaboard colonies from the newly acquired territory to the west by establishing a boundary line along the Appalachian Mountains. The fact that the Proclamation was intended to facilitate British supervision of the colonists by confining them to the east absent specific British authorization suggests that only western settlement was restricted. *See* Gipson, *The Triumphant Empire* at 41–54, 88; 1 P. Smith, *A New Age Now Begins: A People's History of the American Revolution* 166–68 (1976); F. Jennings, *Empire of Fortune: Crowns, Colonies & Tribes in the Seven Years' War* 461 (1988). Such an interpretation does not conflict with the reference to "any lands reserved to the said Indians within those parts of our colonies where we have thought proper to allow settlement," as prior to the Revolution a number of the eastern seaboard colonies claimed extensive territory west of the Appalachian Mountains. *See* Resolution of Congress on Public Lands (Oct. 10, 1780) and commentary, in H.S. Commager, *Documents of American History* 120 (8th ed. 1968) (noting that "[b]y their charters, many of the American colonies were entitled to lands west of the Appalachians, and the Proclamation of 1763, closing these lands to settlement, aroused general resentment.")

Nevertheless, as the portion of the Proclamation relied on by plaintiff is not explicitly restricted to lands west of the Appalachian Mountains, and as all parties inexplicably seem to have assumed that the Proclamation was not so restricted, it will be assumed, without deciding, that the territory named in the complaint falls within the Proclamation.

■ The subject matter jurisdiction of federal district courts is limited to all civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a). A suit "aris[es] under" the Constitution or federal law only if a properly pleaded complaint asserts a right or immunity created by the Constitution or laws of the United States. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987); *Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003–04, 39 L.Ed.2d 209 (1974); *Cox v. Int'l Union of Operating Eng'rs, AFL–CIO*, 672 F.2d 421, 422 (5th Cir.1982). The limits upon federal jurisdiction "must be neither disregarded nor evaded," *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978). If a district court lacks subject matter jurisdiction, dismissal of the action is mandatory. Fed.R.Civ.P. 12(h)(3); *Manway Constr. Co. v. Housing Auth.*, 711 F.2d 501, 503 (2d Cir.1983).

■ Consideration of the nature of a royal proclamation is necessary to determine whether plaintiff's claim under the Proclamation of 1763 is a claim "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331(a). A royal proclamation is not a "law." English legal dictionaries have consistently defined "proclamation" as "a notice publicly given of any thing, whereof the King thinks fit to advertise his subjects." 5 G. Jacob, *Law Dictionary Explaining the Rise, Progress & Present State of the English Law* (1811); J. Cowell, *The Interpreter: or Booke Containing the Signification of Words* (1607). Royal proclamations have not had the force of Acts of Parliament since 1547. 2 E. Jowitt, *Dictionary of English Law* 1418 (1959). A royal proclamation is issued under the royal prerogative and does not involve lawmaking. *Id.* at 1390, 1418. A proclamation by King George III did not have the force of law. *See* Gipson, *The Triumphant Empire* at 6. There is no evidence that the Proclamation of 1763 was intended to create a private right of action.

The Proclamation of 1763 was designed to be temporary. *See* Commager, *Documents of American History* at 47; *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 142, 3 L.Ed. 162 (1810). George III declared that the terms of the Proclamation were "our royal will and pleasure, for the present." Proclamation of 1763, in Washburn, *The American Indian* at 2137. As one historian has noted, "events quickly demonstrated the impermanence of the royal will and pleasure." Jennings, *Empire of Fortune* at 462. Neither the Indians nor the colonists acknowledged the validity of the king's action in issuing the Proclamation. Washburn, *The American Indian* at 2133. It was generally ignored. *See id.* at 462–63; Gipson, *The Triumphant Empire* at 88–90; Smith, *A New Age Now Begins* at 167. George Washington stated that the Proclamation was "considered by government as a temporary expedient … and no further regard has been paid to it by the ministers themselves." Jennings, *Empire of Fortune* at 463 n. 12; *see* Gipson, *The Triumphant Empire* at 46, 51; J. Greene, *Colonies to Nation, 1763–1789: A Documentary History of the American Revolution* 13 (noting that the Proclamation was "intended merely as a stopgap measure to serve until a permanent policy could be worked out"). Hence the Proclamation of 1763 cannot be considered a "law" for purposes of 28 U.S.C. § 1331(a).

Nor is the Proclamation of 1763 "of the United States." 28 U.S.C. § 1331(a). Following the American Revolution, George III "relinquishe[d] all claims to the Government, proprietary and territorial rights" of the United States. Treaty of Peace with Great Britain (Sept. 3, 1783), in Commager, *Documents of American History* at 117–18. The colonists had repudiated the authority of Great Britain in order to establish a new, independent government where "the exercise of every kind of authority under the … Crown should be totally suppressed." Preamble to Resolution of Continental Congress (May 15, 1776) quoted in G.S. Wood, *The Creation of the American Republic, 1776–1787*, at 132 (1969). State executives were given restricted powers and were forbidden from exercising "any power or prerogative by virtue of any Law, statute, or Custom, of England." Maryland and Virginia Constitutions, quoted in Wood, *The Creation* at 137.

*Oneida Indian Nation v. New York*, 520 F.Supp. 1278 (N.D.N.Y.1981), *aff'd in part and rev'd in part*, 691 F.2d 1070 (2d Cir. 1982), is the only reported Indian land claim involving transactions that occurred prior to the adoption of the United States Constitution. The Oneida claimed title to lands acquired by New York State in 1785 and 1788, while the Articles of Confederation were in force. Plaintiff argued that New York's acquisition was invalid for lack of consent by the Confederal Congress. The district court found that federal jurisdiction was lacking under the Articles. *Id.* at 1291. The court exercised pendent jurisdiction over those claims, noting that such an approach was appropriate because New York had incorporated the Articles of Confederation into its statutes in 1778. *Id.* at 1291 n. 13. The Second Circuit, while accepting pendent jurisdiction as the law of the case, questioned that result:

> One may wonder whether New York's incorporation of the Articles was only an act of adherence to the Confederation or in addition was intended to render them part of the positive law of the State, enforceable in its courts. Even if New York courts viewed the Articles as enforceable 'state' law, one may wonder whether they would have ever upheld a claim alleging that the State of New York had violated the Articles by acting in conflict with unexercised power of Congress.

*Oneida Indian Nation v. New York*, 860 F.2d 1145, 1151 (2d Cir.1988), *cert. denied*, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). Hence the existence of even supplemental jurisdiction over a claim under the Articles of Confederation is questionable.

As with a claim under the Articles of Confederation, there is no independent federal jurisdictional basis for a claim alleging violation of a proclamation issued by the British sovereign prior to the formation of the United States. The United States Constitution did not incorporate the Proclamation, but rather established the supremacy of United

States law. *See* U.S. Const., Art. VI, cl. 2;[2] *Owings v. Speed*, 18 U.S. (5 Wheat.) 420, 5 L.Ed. 124 (1820) (holding that Constitution does not extend to state law enacted before 1789) (cited with approval in *Oneida Indian Nation v. New York*, 691 F.2d at 1079 n. 6). Far from adopting the Proclamation, the colonists listed the fact that George III had attempted to place "conditions" on "new Appropriations of Lands" among his "repeated injuries and usurpations" as grounds for declaring independence. Declaration of Independence (July 4, 1776), reprinted in Commager, *Documents of American History* at 100, 101. Nor can a claim under the Proclamation of 1763 be treated as a pendent state law claim, because the Proclamation was not incorporated into state law.

■ Nor, as plaintiff contends, did the Nonintercourse Act of 1790 "implement" the Proclamation of 1763. Upon the signing of the Declaration of Independence, the states assumed power over Indian title that the Proclamation reserved to the Crown. *Oneida Indian Nation v. New York*, 520 F.Supp. at 1311. The states preserved that power under the Articles of Confederation. *Id.* at 1309. Then, "[w]ith the adoption of the Constitution, Indian relations became the exclusive province of federal law." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985) (citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 670, 94 S.Ct. 772, 778, 39 L.Ed.2d 73 (1974); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832)). Congress passed the first Nonintercourse Act pursuant to the constitutional grant of power "to regulate commerce ... with the Indian tribes." U.S. Const., Art. I, § 8, cl. 3.

■ The Nonintercourse Act cannot be applied retroactively, and as a result it does not apply to the land allegedly sold in 1765. Statutes "will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471,

102 L.Ed.2d 493 (1988); *see also United States v. Heth*, 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806). The Act contains no indication that it was intended to provide a remedy for pre-federal claims. The validity of a claim based on violation of the Nonintercourse Act depends on plaintiffs' ability to show "a post-Constitution land interest which was taken from them ... in violation of their rights under that Act." *Oneida Indian Nation v. New York*, 691 F.2d at 1095.

Of the cases cited by plaintiff, none establish federal jurisdiction over a claim based on the Proclamation of 1763, and only one involved pre-constitutional transactions. In *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), plaintiffs claimed land under a grant from Indian tribes during the 1770s. The Supreme Court held that the Indian tribes did not hold, and could not convey, complete title to the land. This ruling was not based on the Proclamation of 1763, but rather on the grounds that "discovery" gave exclusive title to the Europeans, and then to the United States. *Id.* at 573, 587. Jurisdiction appears to have been based on diversity of citizenship. *Johnson v. McIntosh* did not involve the issue presented here. Whether title dating from the Proclamation of 1763 will be recognized is a different question from whether a party may sue in federal court to remedy a wrong prohibited by the Proclamation.

The remainder of the cases cited by plaintiff involved transactions that occurred after formation of the United States, and thus did not decide the question of federal jurisdiction over pre-constitutional claims based on a pre-constitutional edict. In *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986), the Catawba sued under the Nonintercourse Act to invalidate a conveyance that had occurred in 1840, after passage of the Act, for failure to comply with the Act. The court mentioned the Proclamation of 1763 only in passing, as historical background to treaties signed by the Catawba. Similarly, *Fletcher v. Peck*, 10

---

**2.** The United States must be distinguished from Canada, where the Proclamation of 1763 was explicitly incorporated into the Constitution, *see* W.C. Hodge, *Patriation of the Canadian Constitu-* tion: *Comparative Federalism in a New Context*, 60 Wash.L.Rev. 585, 623 (1985), and where as a result it has precedential value. Jennings, *Empire of Fortune*, at 462 n. 10.

U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), involved an 1803 land transfer and a 1795 state statute, not pre-constitutional transactions. In *Fletcher*, the Court mentioned the Proclamation of 1763 only to observe that it temporarily suspended settlement on Indian land but did not alter the boundary of the Georgia colony. *Id.* at 142. *See also Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) (treaties entered into between 1785 and 1819); *United States v. Fernandez*, 35 U.S. (10 Pet.) 303, 9 L.Ed. 434 (1836) (1817 land grant); *Porterfield v. Clark*, 43 U.S. (2 How.) 76, 11 L.Ed. 185 (1844) (1795 land grant). Accordingly, this court does not have jurisdiction over the claims based on the Proclamation of 1763.

### III. *Conclusion*

For the foregoing reasons, the action is (1) dismissed as to claims based on the Proclamation of 1763; and (2) dismissed without prejudice to renewal as to claims based upon the Nonintercourse Act depending on resolution of plaintiff's petition for federal recognition.

Accordingly, the following motions are granted: Hoffman's motion to dismiss filed 11/3/92 (document 50); Hoffman's motion to dismiss filed 12/22/92 (document 64); the United States' motion to dismiss filed 1/8/93 (document 78); Governor Weicker's motion to dismiss filed 2/24/93 (document 98); Ganim's motion to dismiss filed 3/1/93 (document 109); United Illuminating's motion to dismiss filed 3/17/93 (document 123); Southern Connecticut Gas Company's motion for joinder filed 3/9/93 (document 133); Ferreira's motion to discharge notice of lis pendens filed 3/15/93 (document 141); Ganim's motion to dismiss filed 5/7/93 (document 167); and Governor Weicker's motion to dismiss filed 6/18/93 (document 196).

Governor Weicker's motion for leave to file documents (document 194) and Golden Hill's motion for leave to file reply (document 197) are granted *nunc pro tunc*.

The following motions are denied as moot: Governor Weicker's motion to extend time or schedule conference filed 10/15/92 (documents 35–1 and 35–2); Hoffman's motion to sever or stay filed 12/16/92 (documents 60–1 and 60–2); Governor Weicker's motion to modify pretrial order filed 2/24/93 (document 100); Governor Weicker's motion to dismiss filed 2/26/93 (document 104); Governor Weicker's motion to dismiss filed 2/26/93 (document 105); Ganim's motion to dismiss filed 3/1/93 (document 107); Ganim's motion to modify pretrial order filed 3/1/93 (document 111); Southern Connecticut Gas Company's motion to dismiss filed 3/9/93 (document 132); D'Addario's motion to substitute party filed 3/24/93 (document 146); D'Addario's motion to dismiss filed 5/7/93 (document 158); Governor Weicker's motion to compel and for sanctions filed 5/21/93 (documents 173–1 and 173–2); Merrill Lynch's motion to dismiss filed 6/1/93 (document 183); Marini's motion to dismiss filed 6/1/93 (document 184); Marini's motion to dismiss filed 6/1/93 (document 185); Coastal Pallet's motion to dismiss filed 6/1/93 (document 186); Constantini's motion to dismiss filed 6/1/93 (document 187); Constantini's motion to dismiss filed 6/1/93 (document 188); Ferreira's motion to dismiss filed 6/1/93 (document 189); Southern Connecticut Gas Company's motion to compel filed 5/28/93 (document 190); D'Addario's motion to dismiss filed 6/28/93 (document 201); D'Addario's motion to dismiss filed 6/28/93 (document 202); D'Addario's motion to dismiss filed 6/28/93 (document 203); D'Addario's motion to dismiss filed 6/28/93 (document 204); Golden Hill's motion for clarification filed 7/6/93 (document 207); Governor Weicker's motion for temporary restraining order filed 7/13/93 (document 210); Governor Weicker's motion for order filed 7/13/93 (document 212); Governor Weicker's motion to shorten time for response to requests for admission filed 7/20/93 (document ——).

The Clerk shall close the file.

SO ORDERED.