**GOLDEN HILL PAUGUSSETT TRIBE OF INDIANS, Plaintiff–Appellant,**

**Aurelilus H. Piper, Jr., Moonface Bear, Ethel Sherman Piper Baldwin Peters, Plaintiffs,**

v.

**Lowell P. WEICKER, Jr., Governor of Connecticut; Joseph Ganim, Mayor, City of Bridgeport; Hoffman Fuel Co.; et al., Defendants–Appellees.**

**HOFFMAN FUEL CO.; et al., Counter–Claimants,**

v.

**GOLDEN HILL PAUGUSSETT TRIBE OF INDIANS; Aurelilus H. Piper, Jr.; Moonface Bear; Ethel Sherman Piper Baldwin Peters and Lowell P. Weicker, Jr., Governor of Connecticut, Counter–Defendants.**

Nos. 1154–1156, Dockets 93–6227, 93–9059 and 93–9061.

United States Court of Appeals, Second Circuit.

Argued Feb. 18, 1994.

Decided Oct. 28, 1994.

Michael D. O'Connell, Hartford, CT (O'Connell, Flaherty & Attmore, of counsel), for plaintiff–appellant Golden Hill Paugussett Tribe of Indians.

Ellen J. Durkee, Dept. of Justice, Washington, DC (Lois J. Schiffer, Acting Asst. Atty. Gen., Christopher F. Droney, U.S. Atty., Carl J. Schuman, Asst. U.S. Atty., Andrew M. Eschen, Robert L. Klarquist, Dept. of Justice, Scott Keep, Sandra J. Ashton, Office of the Sol., Dept. of the Interior, of counsel), for appellee U.S.

Richard Blumenthal, Office of the Atty. Gen., State of Conn., Hartford, CT (Aaron S. Bayer, Daniel R. Schaefer, Office of the Atty. Gen., State of Conn., Hartford, CT, of counsel), for Lowell P. Weicker, Jr., Governor of the State of Conn. Also of counsel on the brief: Mark R. Kravitz, Noel E. Hanf, Jeffrey R. Babbin, Penelope I. Bellamy, Wiggin & Dana, New Haven, CT, for United Illuminating Co.; Allan Van Gestel, Goodwin, Procter & Hoar, Boston, MA, for Hoffman Fuel Co.; Janet L. Janczewski, J. Richard Tiano, Connecticut Energy Corp., Bridgeport, CT, for The Southern Connecticut Gas Co.; Richard S. Lipman, Schatz & Schatz, Ribicoff & Kotkin, Hartford, CT, for Lafayette Bank & Trust Co., et al.; Stuart A. Margolis, Berdon, Young & Margolis, P.C., New Haven, CT, for Craig E. Moffett; Geoffrey A. Hecht, Virshup, Caplan & Hecht, New Haven, CT, for Union Trust Co., et al.; Mark T. Anastasi, John H. Barton, Office of the City Atty., Bridgeport, CT, for Joseph Ganim, Mayor, City of Bridgeport; James A. Trowbridge, Quinnipiac College School of Law, Bridgeport, CT, for Charlotte Nyzio, et al.; Gerald L. Garlick, Leventhal, Krasow & Roos, P.C., Hartford, CT, for Joyce A. Knoll and Gregory E. Knoll; Howard R. Wolfe, Albert, Ward & Johnson, P.C., Greenwich, CT, for Joseph E. Shapiro and Marjorie Shapiro; Richard J. Buturla, Berchem, Moses & Devlin, P.C., Milford, CT, for D'Addario Industries; Gerald T. Weiner, Judith A. Mauzaka, Weinstein, Weiner & Shapiro, P.C., Bridgeport, CT, for John C. Bachyrycz, Jr., et al.

Before: NEWMAN, Chief Judge, CARDAMONE and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

This is an appeal by the Golden Hill Paugussett Tribe of Indians from judgments of the United States District Court for the District of Connecticut (Dorsey, J.) entered July 22, 1993, August 31, 1993, and September 3, 1993, dismissing without prejudice each of its three claims under the Nonintercourse Act, 25 U.S.C. § 177. *See Golden Hill Paugussett Tribe of Indians v. Weicker,* 839 F.Supp. 130 (D.Conn.1993). Golden Hill's appeals from the judgments of dismissal in all three actions have been consolidated and are now before us for review.

The appeal presents a complex problem involving the intersection of judicial authority over Indian land claims and administrative authority granted to the Department of the Interior's Bureau of Indian Affairs to determine whether a given group of Indians is entitled to tribal recognition. Where an executive agency and the federal courts have overlapping, though not identical, jurisdiction, judicial authority is often best exercised in conjunction with the administrative; one first, the other later.

## BACKGROUND

■ Plaintiff is a group of American Indians that calls itself the "Golden Hill Paugussett Tribe of Indians" (Golden Hill, Tribe or plaintiff). It claims to be an Indian tribe that has resided since time immemorial in the southwest portion of what is now the State of Connecticut. In a complaint filed September 3, 1992 and amended November 6, 1992, Golden Hill sued to reclaim 20 acres of its alleged aboriginal territory.[1] These 20 acres are located within the City of Bridgeport, Connecticut. The complaint alleges that the land, which had been established as a reservation for Golden Hill, was sold by the State of Connecticut in 1802 without the consent of the United States. It further alleges

---

1. This action was originally commenced by both the Tribe itself and individual leaders of the Tribe. Rule 12(b)(6) motions to dismiss the actions brought by individual tribal leaders were consented to by plaintiff. Individual Indians do not fall within the zone of interests to be protect-

ed by the Nonintercourse Act. *See James v. Watt,* 716 F.2d 71, 72 (1st Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). Thus, the only plaintiff now before us is the Golden Hill Paugussett Tribe of Indians.

that until the 1802 conveyance it exclusively owned, used, and occupied the lands at issue. In addition to these 20 acres, the Tribe's complaint refers to various portions of aboriginal and ancestral lands of unstated sizes and of a particular 68–acre lot of aboriginal land each conveyed in violation of a Proclamation of 1763 issued by King George III of Great Britain. With respect to these lands, the complaint was dismissed, 839 F.Supp. at 135–39, and plaintiff has not sought review of that part of the district court's decision.

Golden Hill contends it is entitled to the possession of and to the rents and profits for the 20 acres because it was conveyed in violation of § 4 of the Indian Trade and Intercourse Act of July 22, 1790, ch. 33, 1 Stat. 137, codified as reenacted and amended at 25 U.S.C. § 177 (1988) (Nonintercourse Act or Act). In separate actions, also brought under the Nonintercourse Act, Golden Hill asserted a right to 19 and ¾ acres of land in Trumbull, Connecticut, and 100 acres of land in Orange, Connecticut. The defendants in the three actions are numerous individuals and entities currently in possession of the land that is the subject of those suits, including Lowell P. Weicker, Jr. (as governor of the State of Connecticut) and Joseph Ganim (as mayor of the City of Bridgeport) (collectively State of Connecticut or defendant).

In an answer dated January 15, 1993 the State of Connecticut contended that plaintiff's complaint failed to state a viable cause of action and that the district court lacked subject matter jurisdiction due to plaintiff's failure to allege "that the plaintiff group has been duly recognized by the Secretary of the Interior." On April 20, 1993 the district court directed the parties to address the question of plaintiff's standing, absent tribe certification, explaining that since plaintiff had not alleged that it had been certified as a tribe by the Department of the Interior's Bureau of Indian Affairs (BIA), subject matter jurisdiction over the action was in question. In support of its subsequent motion to dismiss, defendant D'Addario Industries argued that the district court lacked jurisdiction because plaintiff had alleged insufficient facts to support an element of its claim, namely that plaintiff is a "tribe" within the meaning of the Nonintercourse Act. The State, in response to the district court's request to address the issue of plaintiff's standing, argued that lack of federal recognition deprived plaintiff of standing, therefore requiring dismissal of the action.

Golden Hill petitioned the BIA for federal acknowledgment of its existence as an Indian tribe on April 13, 1982. It appears that at least some of the supporting documentation for the Tribe's petition was not submitted to the BIA until April 1993. At the time the district court dismissed Golden Hill's complaint, the administrative petition was in a pre-consideration stage where the BIA reviews it for "obvious deficiencies." According to defendant's brief, after the district court ruled in this case, the BIA completed its deficiency review and notified Golden Hill as to what the agency considered obvious deficiencies in the petition. Under the BIA's regulations, Golden Hill is entitled to submit additional information to cure the deficiencies.

On July 21, 1993 the district court granted defendant's motions to dismiss, explaining that Golden Hill was required to exhaust administrative procedures for tribal recognition prior to seeking a judicial determination of tribal status under the Nonintercourse Act. The district court concluded that "Congress's delegation of authority, the regulations adopted in implementation thereof, and BIA's development of expertise appropriate thereto, amply demonstrate a scheme for determination of tribal status intended and best left at first blush to the BIA." 839 F.Supp. at 135.

The dismissal without prejudice to renew as to plaintiff's Nonintercourse Act claims "depending on resolution of plaintiff's petition for federal recognition," 839 F.Supp. at 139, in effect conditioned plaintiff's standing upon federal administrative agency recognition. The Tribe maintains on appeal that if the question of tribal status were properly viewed as one of standing under Fed.R.Civ.P. 12(b)(6), it would be entitled to an evidentiary hearing in district court to establish its status as an Indian tribe. Plaintiff also insists that because "federal recognition" is not

a prerequisite to satisfying the definition of "tribe" under the Nonintercourse Act claim, the district court erred as a matter of law by directing it to complete the administrative acknowledgment process. While the trial court's opinion is not entirely clear, we believe the central question it decided is that on the issue of tribal status it should defer to the administrative agency. The result the district court reached of withholding a judicial decision until that agency has made an administrative ruling is one with which we agree, although our reasoning is somewhat different and leads to a slightly modified disposition.

## DISCUSSION

### I Statutory and Administrative History

#### A. *The Nonintercourse Act*

We turn now to examine the statutory and administrative history governing the issues before us. In 1790 Congress passed the first Indian Trade and Intercourse Act of which § 4 was the Nonintercourse Act. This Act prohibited the sale by Indians of any land unless the sale was by public treaty made under the authority of the United States. Act of July 22, 1790, ch. 33, § 4, 1 Stat. 137, 138. Congress subsequently amended and reenacted the Act several times making only minor changes to this prohibition. *See* Act of March 1, 1793, ch. 19, § 8, 1 Stat. 329, 330–31; Act of May 19, 1796, ch. 30, § 12, 1 Stat. 469, 472; Act of March 3, 1799, ch. 46, § 12, 1 Stat. 743, 746; Act of March 30, 1802, ch. 13, § 12, 2 Stat. 139, 143; Act of June 30, 1834, ch. 161, § 12, 4 Stat. 729, 730–31; *see generally Mohegan Tribe v. Connecticut,* 638 F.2d 612, 617–18 (2d Cir.1980) (providing history of the Nonintercourse Act), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981). The current version of the Act states, in relevant part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty

or convention entered into pursuant to the Constitution.

25 U.S.C. § 177 (1988).

■ In enacting the Nonintercourse Act Congress codified the widely accepted principles that Indian nations held "aboriginal title" to land they had lived on from time immemorial and that discovering nations held "title in fee," subject to the Indians' rights to occupancy and use of the land. From these two principles flowed the notions that "aboriginal title" could not be extinguished without a sovereign act and, therefore, any conveyance without the sovereign's consent was invalid. *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 233–34, 245, 105 S.Ct. 1245, 1250–51, 1257, 84 L.Ed.2d 169 (1985); *see also The Cherokee Trust Funds,* 117 U.S. 288, 294, 6 S.Ct. 718, 719, 29 L.Ed. 880 (1886). Congress' dual purposes were "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties," *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 119, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960), and to prevent Indian unrest over encroachment by white settlers on Indian lands, *Mohegan Tribe,* 638 F.2d at 621–22. The Act created a trust relationship between the federal government and American Indian tribes with respect to tribal lands covered by the Act. *See Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 379 (1st Cir.1975) (*Passamaquoddy* ).

■ To establish a *prima facie* case based on a violation of the Act, a plaintiff must show that (1) it is an Indian tribe, (2) the land is tribal land, (3) the United States has never consented to or approved the alienation of this tribal land, and (4) the trust relationship between the United States and the tribe has not been terminated or abandoned. *See Catawba Indian Tribe v. South Carolina,* 718 F.2d 1291, 1295 (4th Cir.1983), *aff'd,* 740 F.2d 305 (4th Cir.1984) (en banc), *rev'd on other grounds,* 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986); *Epps v. Andrus,* 611 F.2d 915, 917 (1st Cir.1979) (per curiam).

## B. *The Regulatory History*

In 1832 Congress established the position of Commissioner of Indian Affairs (currently within the Department of the Interior) and delegated to the Commissioner the authority to manage all Indian affairs. *See* Act of July 9, 1832, ch. 174, § 1, 4 Stat. 564 (codified at 25 U.S.C. §§ 1, 2 (1988)). Two years later Congress granted the President authority to "prescribe such rules and regulations as he may think fit, for carrying into effect the various provisions of [any act] relating to Indian affairs . . . ." Act of June 30, 1834, ch. 162, § 17, 4 Stat. 735, 738 (codified as amended at 25 U.S.C. § 9 (1988)). At the same time Congress established the Department of Indian Affairs, predecessor to the BIA. *See* Act of June 30, 1834, ch. 162, 4 Stat. 735 (codified as amended at 25 U.S.C. § 1 *et seq.* (1988)).

Between 1834 and 1871 Congress continued to deal directly by means of its treaty-making power with American Indian tribes, but in 1871 recognition by treaty ended as Congress terminated its treaty-making authority. *See* Act of March 3, 1871, ch. 120, § 1, 16 Stat. 544, 566 (codified at 25 U.S.C. § 71 (1988)). Numerous reasons were advanced for termination of Indian policy based on treaty negotiations. After the War of 1812 the military importance of alliances with Indian tribes was diminished. The movement to end treaty making gained strength as a result of alliances between some of the southern Indian tribes and the Confederacy. The final decision to end treaty making resulted from a movement by members of the House of Representatives to equalize power between that body and the Senate through the removal of Indian relations from the treaty-making process. When formal treaty making was abandoned, the federal government continued to make agreements with Indian tribes, similar to treaties, but requiring approval by both houses of Congress, and government policy with respect to Indians was expressed through legislation and executive orders. *See generally* Felix S. Cohen, *Handbook of Federal Indian Law* (1982 ed.) 105–07.

The Department of the Interior did not actively begin to engage in recognition determinations until after the passage of the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461–479 (1988)). After passage of the Indian Reorganization Act recognition proceedings were necessary because the benefits created by it were made available only to descendants of "recognized" Indian tribes. *See* 25 U.S.C. § 479.

Between 1934 and 1978 the Department of the Interior and the BIA recognized American Indian tribes on a case-by-case basis. *See* 59 Fed.Reg. 9280, 9280 (1994). In 1978 the Department of the Interior promulgated regulations establishing a uniform procedure for acknowledging American Indian tribes. *Id.; see* 25 C.F.R. §§ 83.1–83.13 (1994). Under these regulations recognition creates a government-to-government relationship between the tribe and the United States, and makes the tribe eligible for those services and benefits available to other federally recognized tribes. *See id.* § 83.2. With this history firmly in mind, we turn to the merits of this appeal.

## II Standing and Exhaustion of Administrative Remedies

The question we must answer is whether plaintiff, as a group of American Indians seeking to invoke the Nonintercourse Act in federal court, must first complete acknowledgement proceedings before the BIA. Since this is a jurisdictional issue, our review is *de novo*. *See Hotel & Restaurant Employees Union Local 217 v. J.P. Morgan Hotel,* 996 F.2d 561, 564 (2d Cir.1993). We do not think that either lack of standing or failure to exhaust administrative remedies provides good grounds for the district court's dismissal of plaintiff's suit. First, we note that tribal status for purposes of obtaining federal benefits is not necessarily the same as tribal status under the Nonintercourse Act. Second, we note that tribal status for purposes of the Act relates both to standing to sue under the Act and to the merits of a claim under the Act. The two issues are distinct, though they overlap to a considerable extent.

■ Here plaintiff pled its tribal status and reliance on the Nonintercourse Act as the foundation of its claim. Golden Hill alleged that it is an Indian tribe that has resided in the State of Connecticut since time immemorial and that it exclusively owned, used and occupied the lands which were within its aboriginal territory. More specifically, Golden Hill asserted that each of the properties in question had been established by Connecticut as reservations for the plaintiff Tribe prior to the illegal conveyances that form the basis of its Nonintercourse Act claims. Each of plaintiff's claims is based on the loss of the lands set aside for plaintiff first by the Colony and subsequently by the State of Connecticut. The dates of the transactions by which Golden Hill's reservation properties were conveyed spanned the period between 1802 and 1854 and the subject conveyances were allegedly made without the consent of the United States. Accordingly, the plaintiff tribe has pled in each of its three complaints all of the elements of a Nonintercourse Act claim. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) ("[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to show standing). Such allegations satisfy the minimum constitutional requirements for standing. *See id.* at ——, 112 S.Ct. at 2136 (constitutional minimum to demonstrate standing requires an injury in fact, a causal connection between the injury and the conduct complained of, and redressability).

■ In addition to the minimal constitutional requirements for standing, there are court-imposed prudential limits to invoking the jurisdiction of the federal courts. The plaintiff must (1) be asserting its own legal rights, and not those of a third party, (2) be asserting, in addition to a redressable injury, a particularized grievance, and (3) be asserting a claim that falls within that zone of interests the statute aims to protect or regulate. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). Golden Hill met these prudential requirements by asserting that it has a right to possess its aboriginal territory, by averring that it had a specific, concrete grievance based on allegedly illegal conveyances of the land it claims, and by declaring that it is an Indian tribe, *i.e.,* a group intended to be protected by the Nonintercourse Act and as such entitled to possession, plus the rents and profits attributable to the land it claims.

■ Besides plaintiff's lack of standing, the district court suggested it lacked jurisdiction over plaintiff's cause of action because the Tribe had failed to exhaust administrative remedies. 839 F.Supp. at 134–35. The exhaustion of administrative remedies doctrine holds that a litigant must generally pursue all available administrative remedies before seeking judicial review of an administrative action. *See Touche Ross & Co. v. SEC,* 609 F.2d 570, 574 (2d Cir.1979). The doctrine is premised on the notion that it is better to allow an agency to employ its expertise first in developing the facts. *See id.* The exhaustion requirement protects the integrity of the administrative process and prevent parties from avoiding agency procedures. *See id.* This doctrine applies when "a claim is cognizable in the first instance by an administrative agency alone." *United States v. Western Pac. R.R.,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

■ The Tribe's claim is not cognizable in the first instance solely by the BIA. In fact, the BIA lacks the authority to determine plaintiff's land claim. Regardless of whether the BIA were to acknowledge Golden Hill as a tribe for purposes of federal benefits, Golden Hill must still turn to the district court for an ultimate judicial determination of its claim under the Nonintercourse Act.

### III Primary Jurisdiction

■ We move on to a stronger reason urged by the defendant to support the district court's dismissal of plaintiff's three complaints. The doctrine of primary jurisdiction gives us a ground for affirming. Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually

of a factual nature, which are placed within the special competence of the administrative body. *See Western Pac. R.R.*, 352 U.S. at 63–64, 77 S.Ct. at 165; *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 302, 93 S.Ct. 573, 580, 34 L.Ed.2d 525 (1973). We may affirm on this basis, although it was not the reason given by the district court for the action it took. *See Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir.1992).

The threshold issue in determining whether this doctrine applies is whether both the court and an agency have jurisdiction over the same issue. *See Ricci*, 409 U.S. at 299–300, 93 S.Ct. at 579 (primary jurisdiction is applicable where the subject of court litigation is "at least arguably protected ... by another regulatory statute"). Primary jurisdiction and exhaustion of administrative remedies are both "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Western Pac. R.R.*, 352 U.S. at 63, 77 S.Ct. at 165. The primary jurisdiction doctrine serves two interests: consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims. *See, e.g., Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976); *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 851 (2d Cir.1988).

Federal courts have held that to prove tribal status under the Nonintercourse Act, an Indian group must show that it is "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *See, e.g., United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926) (quoting *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 359–60, 45 L.Ed. 521 (1901)); *Catawba Indian Tribe*, 718 F.2d at 1298; *Passamaquoddy*, 528 F.2d at 377 n. 1. The formulation of this standard and its use by the federal courts occurred after Congress delegated to the executive branch the power to prescribe regulations for carrying into effect statutes relating to Indian affairs, *see* 25 U.S.C. § 9, and without regard to whether or not the particular group of Indians at issue had been recognized by the Department of the Interior. *See, e.g., Candelaria*, 271 U.S. at 442, 46 S.Ct. at 563; *Catawba Indian Tribe*, 718 F.2d at 1298; *Passamaquoddy*, 528 F.2d at 377.

In 1978 the BIA promulgated regulations governing procedures for American Indian tribes to be federally recognized. To be acknowledged as a tribe, a group of Indians must show, *inter alia*, that (a) they have been identified since 1900 as "American Indian" or "aboriginal" on a substantially continuous basis, (b) a predominant portion of their group comprises a distinct community and has existed as such from historical times to the present, and, (c) they have maintained tribal political influence or authority over its members as an autonomous entity throughout history until the present. *See* 25 C.F.R. § 83.7.

The *Montoya/Candelaria* definition and the BIA criteria both have anthropological, political, geographical and cultural bases and require, at a minimum, a community with a political structure. The two standards overlap, though their application might not always yield identical results. A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinated action.

Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the legislative scheme. *See Ricci*, 409 U.S. at 304, 93 S.Ct. at 582. The BIA has the authority to prescribe regulations for carrying into effect any act relating to Indian affairs. *See* 25 U.S.C. § 9 (1988). Before the promulgation of the acknowledgment regulations there did not exist a uniform, systematic

**60**

procedure to determine tribal status within the Department of the Interior. Therefore, deferral of the issue of tribal status was not required nor would it aid a court in its determination. The Department of the Interior's creation of a structured administrative process to acknowledge "nonrecognized" Indian tribes using uniform criteria, and its experience and expertise in applying these standards, has now made deference to the primary jurisdiction of the agency appropriate. In fact, the creation in 1978 of the acknowledgment process currently set forth in 25 C.F.R. Part 83—a comprehensive set of regulations, the BIA's experience and expertise in implementing these regulations, and the flexibility of the procedures weigh heavily in favor of a court's giving deference to the BIA. We need not decide whether deference would be appropriate if no recognition application were pending, but deferral is fully warranted here where the plaintiff has already invoked the BIA's authority.

■ The general notion of deference was the philosophical basis for Justice Frankfurter's opinion in *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). There, in writing for the Court, he explained that issues of fact not within the ordinary ken of judges and which required administrative expertise should be resolved preliminarily by the agency, which Congress has vested with authority over the subject matter, even though the ascertained facts later serve "as a premise for legal consequences to be judicially defined." *Id.* at 574, 72 S.Ct. at 494. A court should delay forging ahead when there is a likelihood that agency action may render a complex fact pattern simple or a lengthy judicial proceeding short. *See Rohr Industries v. Washington Metro. Area Transit Auth.,* 720 F.2d 1319, 1325 (D.C.Cir.1983); *see also Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 338–40, 83 S.Ct. 379, 383–84, 9 L.Ed.2d 350 (1963) (district court properly delayed adjudication until the Department of the Interior had determined in administrative proceedings the validity of mining claims, such validity being one of the issues involved in the judicial proceeding).

■ Thus, the judicial hand should be stayed pending reference of plaintiff's claims to the agency for its views. *See Western*

*Pac. R.R.,* 352 U.S. at 63–64, 77 S.Ct. at 165. A federal court, of course, retains final authority to rule on a federal statute, but should avail itself of the agency's aid in gathering facts and marshalling them into a meaningful pattern. *See Federal Maritime Bd. v. Isbrandtsen Co.,* 356 U.S. 481, 498, 78 S.Ct. 851, 861, 2 L.Ed.2d 926 (1958). As a consequence, under the present circumstances, the BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether Golden Hill meets the criteria for tribal status. This is a question at the heart of the task assigned by Congress to the BIA and should be answered in the first instance by that agency. *See Chicago Mercantile Exch. v. Deaktor,* 414 U.S. 113, 114–15, 94 S.Ct. 466, 466–67, 38 L.Ed.2d 344 (1973) (per curiam) (error not to defer to administrative agency, when an issue of the dispute is "at the heart" of task assigned to agency by Congress). The BIA's resolution of these factual issues regarding tribal status will be of considerable assistance to the district court in ultimately deciding Golden Hill's Nonintercourse Act claims. *Cf. Ricci,* 409 U.S. at 305, 93 S.Ct. at 582 (prior agency adjudication will be a material aid in deciding whether the Commodities Exchange Act forecloses antitrust suit).

■ We may not end this opinion without adverting to the only issue that gives us pause, that is, the question of added delay. There clearly is a public interest in reasonably prompt adjudication of plaintiff's claims. The government has advised us, in that connection, that a determination by the BIA could take up to two years. Innocent landowners must not suffer the consequences of a cloud on their titles while an administrative agency handles the matter before it in a leisurely manner when, under the circumstances, it should be on a "fast-track" instead.

We deem it appropriate therefore on remand to direct the district court to stay Golden Hill's action, rather than dismiss it. This course will permit Golden Hill to reapply to the trial court for a ruling on the merits, if within 18 months the BIA has not then ruled on plaintiff's tribal status. *See Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 206 (5th Cir.1988) (in order to protect party's rights and avoid inordinate

delay while seeking expertise of FERC, order of dismissal vacated and proceedings stayed for 180 days). Were no agency ruling to be made within this specified time frame, we are not requiring a dissolution of the stay. Rather such lapse should simply provide the BIA or the defendants an opportunity to show why the stay should not then be dissolved. Upon failure to make such a showing or resolve the question of tribal status with the 18–month period, the district court will then be able to reach the merits of this case. *See id.* (if no FERC determination is made within 180–day stay or no extension of stay is granted by the district court for good cause shown by FERC, then district court should proceed to adjudicate the merits of the case without further deference to the agency).

### CONCLUSION

Accordingly, for the reasons stated, we remand this matter to the district court with directions that it stay the proceedings in its court pending the BIA's consideration of Golden Hill's claim for tribal recognition, the duration and termination of the stay to be determined in accordance with this opinion.